**In the Matter of The REQUESTED EXTRADITION OF James Joseph SMYTH.**

**No. CR 92–0152 MISC BAC.**

United States District Court, N.D. California.

Sept. 15, 1994.

See also 826 F.Supp. 316.

Mark N. Zanides, Asst. U.S. Atty., San Francisco, CA, for U.S.

Karen Snell, Asst. Federal Public Defender, San Francisco, CA, for James Joseph Smyth.

### *ORDER*

CAULFIELD, District Judge.

This matter comes before the court for consideration of the request for the extradition of James Joseph Smyth to the United Kingdom of Great Britain and Northern Ireland. The court denies the request to certify Mr. Smyth for extradition for the reasons set forth below.

## I. *PROCEDURAL HISTORY.*

James Joseph Smyth was convicted of attempted murder and sentenced to twenty years' imprisonment in Belfast, Northern Ireland in 1978. In September 1983, 38 prisoners, including Smyth, escaped from the Maze Prison in Belfast. Smyth arrived in San Francisco, California in 1984. Since that time he has lived and worked peacefully in the community.

On April 30, 1992, the United States Attorney filed a Complaint seeking a warrant for the provisional arrest of James Joseph Smyth for extradition to the United Kingdom of Great Britain and Northern Ireland ("U.K."). On May 27, 1992, the U.S. Attorney filed an Indictment in this District charging Smyth with making a false statement in a passport application in violation of 18 U.S.C. Section 1542. Smyth was arrested on the passport charge in San Francisco and taken into custody on June 3, 1992. The U.S. Attorney withheld execution of the provisional arrest warrant issued on April 30th. Smyth was arraigned on June 9, 1992. Judge Claudia Wilken heard arguments on Smyth's request to be released on bail pending trial on the passport charge, and ordered that Smyth be detained pending trial on the passport charge. On July 14, 1992, this court granted Smyth's request for release pending trial.

One day after this court granted Smyth's request for bail, the government executed the provisional arrest warrant and requested that Smyth be detained pending extradition to Great Britain. On September 14, 1992, the United Kingdom filed a formal request for the extradition of James Joseph Smyth to serve the remainder of his sentence for the 1978 attempted murder conviction. This court granted Smyth's request for bail under the requirement of special circumstances, a decision later reversed by the Ninth Circuit Court of Appeals.

Extradition of Mr. Smyth is sought pursuant to the Supplementary Extradition Treaty between the Government of the United States and the Government of the United Kingdom of Great Britain and Northern Ireland, which went into effect on December 23, 1986 ("Supplementary Treaty"). Mr. Smyth seeks to avoid extradition by raising a defense under Article 3(a) of the Supplementary Treaty: that he would, if surrendered, be prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions.

Several months before the extradition hearing, this court ruled that Article 3(a) created an exception to the traditional rule of non-inquiry in extradition matters, permitting the person being sought the right to establish that he individually would be prejudiced as a result of discriminatory treatment within the requesting country's criminal justice system.[1]

Smyth sought discovery of several documents which he contends support his claim that he would be "punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions" if surrendered. The documents Smyth sought included the Stalker–Sampson Reports, the Kelly Report, documents regarding the Stevens inquiry and a statement of information on ex-prisoners available to security forces on the streets of Northern Ireland. The Stalker–Sampson Reports documented the investigation of members of the Royal Ulster Constabulary for the shooting deaths of six people in 1982 whom the officers suspected of being members of the Provisional Irish Republican Army. The purpose of the inquiry was to determine whether or not criminal offenses involving, *inter alia*, the giving of false or misleading evidence and conspiracy to pervert the course of justice had been committed. The Kelly Report memorialized the review of Charles Kelly, the chief constable in Staffordshire, England, who was appointed in 1988 to consider whether disciplinary charges should be brought against constables who had been identified by Stalker and Sampson as having committed murder and other criminal of-

---

1. Thus the court permitted presentation of: (1) evidence relating to mistreatment Mr. Smyth received at the hands of the security forces prior to his 1977 arrest; (2) evidence regarding irregularities in Smyth's trial in the Diplock court system upon a showing that the irregularities resulted from discrimination on the bases of religion, nationality or political views; (3) conditions of Mr. Smyth's confinement, provided such evidence tended to show that any poor treatment suffered resulted from discrimination on the bases of race, religion, nationality or political views; and (4) evidence that Mr. Smyth himself would be subject to restraints on his liberty or at risk of assassination upon release from the Maze, provided that there was a showing that the government has explicitly tolerated or has been materially involved in any plots to restrain his liberty or assassinate him. (May 6, 1993 Order.)

fenses. The Stevens inquiry investigated allegations of collusion between members of the security forces and loyalist paramilitaries.

The U.K. objected to producing the documents, claiming that they were irrelevant and were protected from disclosure by the state secrets privilege, deliberative process privilege, and investigatory files privilege.

After a review of the description of the documents in question, the court found that the documents were relevant for discovery purposes. In light of Smyth's strong showing of need for the documents and the vagueness of the U.K.'s declarations invoking privileges from production, the court determined that an *in camera* review of the documents was necessary. Suggestions from the U.K. regarding the redaction of particularly sensitive information pertaining to the identity or activities of security forces personnel were invited. The U.K. responded that it would not be possible to redact the documents and declined to submit the documents for any *in camera* review by the court.

The U.K.'s refusal to produce the documents led this court to grant the following rebuttable presumptions to Smyth as a remedy to balance the competing interests:

(1) Catholic Irish nationals accused or found guilty of offenses against members of the security forces or prison officials are subjected systematically to retaliatory harm, physical intimidation and death in Northern Ireland.

(2) Members of the security forces in Northern Ireland either participate directly or tacitly endorse these actions.

The court intended the presumptions to balance the refusal to produce the relevant documents with Smyth's right to review those documents to aid his defense. The presumption granted by the court shifted the burden of production to the U.K., but Smyth retained the ultimate burden of proof in establishing his defense to extradition. The court later ruled that the presumption must be rebutted by the U.K. by a preponderance of the evidence.

The parties to the proceedings agreed that the Federal Rules of Evidence do not apply in extradition proceedings. Fed.R.Evid. 1101(d)(3). The court received all evidence introduced. The government and Smyth introduced statistical reports. Witnesses interpreted many of the statistical reports. The court considered appointing an expert under Federal Rule of Evidence 706(a) but declined to make the appointment. The review of the statistical evidence by the court and the testimony of the witnesses interpreting the evidence demonstrates the inability to draw any logical conclusion from the statistical evidence. The statistical evidence regarding a pattern of arrests, detentions, or treatment of individuals in Northern Ireland is flawed by the lack of scientific recordkeeping or collection techniques. Therefore, the court declines to rely upon statistics collected for the purpose of the Smyth case by either the U.K. or Mr. Smyth. The court instead will evaluate the evidence of witnesses testifying at trial on the issues presented to the court.

## II. FINDINGS OF FACT.

### A. Background on the Political Violence in Northern Ireland.

1. Northern Ireland has a population of about 1,500,000. The population is approximately 62% Protestant and 38% Roman Catholic. The largest city in Northern Ireland is Belfast. Within Belfast is the Ardoyne neighborhood, a Catholic nationalist area with a population of 15,000–20,000. James Smyth is from the Ardoyne neighborhood.

2. There are two main ideological combinations in Northern Ireland: people who wish Northern Ireland to unite with the Republic of Ireland and people who wish it to remain part of the United Kingdom. "Nationalists" are those people who desire a united political entity encompassing Northern Ireland and the Republic of Ireland. Within the nationalist combination exist the "republicans," who believe that the use of violence is a legitimate means of pursuing that goal. A subset of the republicans actually take up arms in pursuit of that goal. "Unionists" are those people who desire Northern Ireland to remain a part of the United Kingdom. Within the unionist combi-

nation exist the "loyalists," who believe that the use of violence is a legitimate means of pursuing that goal. A subset of the loyalists actually take up arms in pursuit of their goal. Nationalists are from the Catholic community and unionists are drawn from the Protestant community.

3. Sinn Fein is a minority political party in Northern Ireland, capturing about ten percent of the popular vote. Sinn Fein's political aim is generally aligned with the republican ideology and seeks to establish a socialist republic for the Republic of Ireland and Northern Ireland.

4. The current chapter in the civil unrest in Northern Ireland began in August 1969, when Protestant unionists attacked Catholic nationalist neighborhoods. People were shot and stoned; homes and cars were burned. The local constabulary was unable to control the situation and British Army troops arrived. Twenty-five years later, the British Army remains in Northern Ireland.

5. On the republican side, the main paramilitary organizations are the Provisional Irish Republican Army ("IRA") and the Irish National Liberation Army. There are roughly 400 active service members (i.e., those actively involved in carrying out violent acts) in the IRA. The IRA has publicly announced that the British Army and persons who work for the Army are targets. Government sources estimate that 97% of the 1,726 bombings and two-thirds of the shootings relating to the political violence in Northern Ireland were done by republican terrorists in the 1987–1992 period.

6. On the loyalist side, the main paramilitary organizations are the Ulster Freedom Fighters and the Ulster Volunteer Force. These organizations are closely associated with the Ulster Defense Association. Loyalist paramilitaries have typically shot their victims, although they increasingly use explosives. Loyalist paramilitary violence is directed largely against the Catholic population and generally not against the security forces.

7. Since 1969, over 3,000 people, including more than 2,100 civilians, have been killed in the political violence in Northern Ireland. Over 35,000 people, including over 23,000 civilians, have been injured. Over 15,000 people have been charged with terrorist-type offenses. In the last few years, loyalist violence has increased dramatically; in 1992, more than half the terrorist murders were committed by loyalists.

8. Membership in either the republican or loyalist paramilitary organizations is highly secretive. Indeed, merely being suspected of being a member can subject one to intense police attention and death from the opposing paramilitary organization. Thus, while the organizations take credit for their violent deeds, rarely will any individual publicly take credit for being in one of the organizations.

9. The republican and loyalist paramilitary organizations make efforts to learn who their opponents are to target them for violence. When a person's "details"—such as his name, address, workplace, patterns of movement, or picture—are known to paramilitaries on the opposing side, the person's risk of harm increases greatly. The police force takes the danger seriously and frequently warns individuals that they are in imminent danger because their "details" are known to persons with criminal intent. At the hearing, evidence was presented of republicans being warned that their details were in the hands of loyalist paramilitaries shortly before the suspected republicans were shot or murdered. Many of these attacks took place in the victims' own homes.

B. *Government Efforts in Connection with the Political Violence.*

10. Approximately ten percent of the government expenditures in Northern Ireland is devoted to sustaining the security effort. This is approximately $1,400 per capita in Northern Ireland for the security effort. There are approximately 30,000 persons in the Royal Ulster Constabulary and British Army (collectively referred to as the "security forces") in Northern Ireland.

11. The Royal Ulster Constabulary ("RUC") performs the policing function in Northern Ireland. In addition to the 8,400 full-time regular RUC members, there are 4,200 RUC Reserve members. The RUC is 93% Protestant.

12. Since 1969, British Army troops have been deployed in Northern Ireland. The stated purpose for the Army's presence is to protect the RUC as the RUC performs its police function when policing is too dangerous to do without military support. Part of the British Army serving in Northern Ireland is the Royal Irish Regiment ("RIR") (successor to the former Ulster Defense Regiment ("UDR")). The UDR/RIR is a combination of full- and part-time soldiers recruited in Northern Ireland to serve in Northern Ireland. There are 18,500 regular British Army troops and 5,500 UDR/RIR troops serving in Northern Ireland.

13. Some residents of the republican neighborhoods do wish a police presence to ward off attacks by loyalist terrorists. Two of the U.K.'s witnesses stated that even though residents desire a police presence, the residents may not want that presence to include tanks and soldiers carrying machine guns. Although one U.K. witness stated that automatic weapons are kept down and not pointed at people routinely, another U.K. witness stated that sometimes weapons are held level so the soldiers look alert and deter sniper fire.

14. Certain laws are in place in Northern Ireland because the government has determined that a state of emergency exists. The Northern Ireland (Emergency Provisions) Act ("EPA") was originally enacted in 1973 and has been amended and reenacted over the years. The Prevention of Terrorism (Temporary Provisions) Act ("PTA") was originally enacted in 1974 and has been amended and reenacted over the years. The EPA applies only in Northern Ireland and the PTA applies throughout the United Kingdom. Included in the EPA and PTA are the following provisions, which give the security forces substantial powers and considerable discretion.

a. Any member of the security forces "may stop any person for so long as is necessary" in order to question him for the purpose of ascertaining his identity and movements and what the person knows concerning any recent explosion or any other recent incident endangering life. Reasonable suspicion of criminal activity is not necessary. Failure to stop or to respond to such questioning is a crime.

b. A British Army soldier may arrest without warrant, and detain for up to four hours, any person the soldier has reasonable grounds to suspect is committing, has committed, or is about to commit any offense.

c. A constable may arrest without warrant any person whom the constable has reasonable grounds to suspect is committing, has committed, or is about to commit a terrorist-type offense. The arrestee may be detained for up to 48 hours after the arrest, but this detention may be extended for an additional five days, for a total of seven days.

d. When a person is arrested and being interrogated, access to a solicitor or notification of a third party of the arrest can be delayed up to 48 hours. Sometimes, consultations with solicitors are supervised by constables. A solicitor may not sit in on the interrogation of the client.

e. A person may be detained for up to seven days for interrogation. During the detention, prisoners are kept in solitary confinement. An RUC Deputy Inspector stated that it might be possible to make arrangements for a relative to be allowed to visit a detainee, but he had never seen it happen. There are no phone calls, no religious services, and no exercise available to the detainee. Toilet facilities are available on request. These procedures are the same for republican and loyalist detainees.

f. Exclusion orders may be imposed against a person who is determined to be involved in terrorism. An exclusion order prohibits a person from entering one or more countries in the United Kingdom. These orders may be imposed regardless of whether the person has been convicted of a crime. There were 81 exclusion orders in place in 1992.

g. The Secretary of State may issue a detention order if there are grounds for suspecting that a person has been concerned in the commission of terrorism or directing, organizing or training of terrorists. The internment may last for several weeks.

h. Membership in loyalist or republican paramilitary organizations, such as the IRA, is a crime.

6. The government censors the broadcast of voices of representatives of Sinn Fein, the IRA, and persons supporting such organizations. When a member or supporter of one of these organizations speaks on television, there is a voice-over or subtitles with no sound.

7. The security forces have established observation towers which resemble towers over prison perimeters, to overlook republican and loyalist neighborhoods.

8. Vehicle check points are set up around the Ardoyne neighborhood in Belfast to prevent loyalist gangs from entering and to watch for the movement of explosives into and around the area. The security forces at the vehicle check points do not randomly check vehicles; they search vehicles driven by suspected or known terrorists, vehicles coming from houses occupied or frequented by suspected terrorists, and vehicles with certain physical characteristics (such as vans and overweight vehicles). There are no official instructions to stop a person based on religious or political views or ex-prisoner status. One RUC inspector did state that the RUC intelligence is that Sinn Fein is the political wing of the IRA, and that well-known Sinn Fein members likely would be stopped by RUC constables.

9. The threat to the security forces is greater in republican than loyalist areas.[2] Constables are more likely to be accompanied by British Army troops in republican areas. Typically, sixteen soldiers accompany two or three RUC constables on patrol. In recent years the routine has been one or two patrols through the Ardoyne neighborhood, with each patrol lasting 60 to 90 minutes. Persons are stopped and questioned during the patrol. Major Anthony Brown of the British Army stated that the patrols stopped suspicious people if there had been an incident and otherwise people were stopped and questioned on a "totally random basis." Major Brown also stated that there were probably no more than a dozen searches each day.

The Army may arrest and detain a person for up to four hours and need not make any record of the arrest.

10. If a citizen wishes to make a complaint against a member of the security forces, it is difficult to do so. Recording information about security forces is discouraged by a law that makes it illegal in Northern Ireland to record, write down or collect identifying information about members of the security forces unless the person can prove he has a reasonable excuse for doing so. (EPA § 31.) Some citizens wishing to lodge a complaint feel they must keep the numbers of errant security forces memorized to avoid problems with this law. Additionally, figuring out who the errant member of the security forces is can be difficult. RUC constables wear numbers on their uniform shoulders so they can be identified if anyone wishes to lodge a complaint, but some constables pull these numbers off their uniforms and refuse to give their numbers to inquiring citizens, effectively blocking any identification of the constable for a complaint. British Army soldiers wear nothing that identifies them individually. They also on occasion wear camouflage face paint and helmets, making it even more difficult to identify any individual soldier. In late 1992, the Army began carrying calling cards to give out on request so that people would know the identity of the patrol if they wished to lodge a complaint, but at least one witness states that the cards are not distributed cooperatively.

11. According to government statistics, in the 1983–1993 time period, sixty-seven Catholics and six Protestants were killed by on-duty security forces and seven more were killed by off-duty security forces. Charges were filed against 21 members of the security forces for ten of the killings. Eight of the 21 were convicted.

12. The U.S. State Department's Report on Human Rights Practices for 1992 submitted to a U.S. Senate committee found, *inter alia*, that "[s]ecurity forces in Northern Ireland frequently harass citizens verbally, particularly young people in areas where com-

---

2. Due to the recent upswing in loyalist violence, patrolling of loyalist areas increased toward the end of 1991 and military accompaniment was required.

munity support for [the IRA] is considered high," and that "[d]iscrimination on religious grounds continued to occur in Northern Ireland, including at times by local governments."

C. *Problems With The Security Forces.*

1. Over the years, only about 25% of those persons detained for terrorism-related interrogation are actually charged with a crime. In 1992, 1,795 persons were arrested for terrorist-type offenses but only about 400 were charged. The people arrested were disproportionately republicans—approximately 1,100 of the 1,300 + persons arrested but not charged were republicans.

2. Some 3,000 dwellings were searched last year by security forces. Tens of thousands of dwellings have been searched during the past 25 years in connection with the political violence. In most searches of dwellings, the RUC does not find munitions. The RUC attributes part of this lack of success to the constant movement of munitions. Sometimes, the security forces damage portions of the structure or its contents in search of secret hiding spots for weapons and explosives. Evidence was presented that security forces have ripped up floor boards and torn out portions of walls in unsuccessful searches. Compensation is available for damage caused by the searches.

3. Once the security forces suspect a person of involvement in republican terrorism, they have many contacts with the person. The court finds that the security forces consider a person's status as a republican to be sufficient grounds alone to justify arrest, detention and interrogation. Witnesses described being arrested and interrogated dozens of times without any charges being filed. Often, they would be questioned about general topics, and not a specific incident. The proportion of crimes charged and convictions to the number of detentions is quite small. The detentions and frequent questioning were used to gather intelligence rather than

to solve a particular crime. One high profile witness at the extradition hearing had been stopped, questioned and had her car searched seven times on a single drive.

4. Frequent contact with the security forces marks a person as a target for loyalist terrorists if seen being detained often, or frequently having a car or home searched. Once a suspected republican's "details" are known to loyalist paramilitaries, the suspected republican's life is in great danger. In several instances, people were killed shortly after being warned by the RUC that their details were known to paramilitaries. There were also two incidents in which people were told by the RUC that their details were known to the loyalist paramilitaries, and were denied permits to possess personal protection firearms.

5. The security forces attempt to prevent what they characterize as "paramilitary trappings" at funerals of deceased republicans. Paramilitary trappings include the wearing of uniforms and red berets, the discharge of weapons by mourners, and—to some in the RUC—draping the flag of the Republic of Ireland over the coffin. The RUC's policy is to advise the next of kin that there will be a police presence at the funeral if the next of kin is planning the display of any paramilitary trappings. Witnesses recounted several instances of heavy police presence and disruption of wakes and funerals by the police. One member of the RUC reported that the police presence at funerals has decreased in recent years.

6. In 1989, the RUC appointed John Stevens, Deputy Chief Constable of Cambridgeshire, England, to investigate allegations of collusion between members of the security forces and loyalist paramilitaries. Stevens produced a report containing the results of his inquiry and recommendations to remedy certain problems discovered.[3] The Stevens inquiry concluded that official information

---

**3.** The U.K. refused to produce this report, and witnesses for the U.K. refused to discuss its contents. The U.K. did, however, produce a summary of the Stevens Report and witnesses did comment on the contents of the summary. The summary contained over eighty recommendations for improvement. Witnesses for the U.K.

testified that almost all of the recommendations were implemented, but refused to identify which of the recommendations were implemented and how they were implemented. The facts recited in the accompanying paragraph of text are taken from the summary of the Stevens report and a chart of outcomes of criminal proceedings.

produced by the RUC, British Army and the prison service had passed into the hands of loyalist paramilitary groups who in turn used the information and documents to enhance their own intelligence system and aid them in targeting suspected republican terrorists. It was also determined that certain members of the UDR (the native portion of the British Army) had been involved in collusion with loyalist paramilitaries, but the passing of information was neither widespread nor institutionalized. Some 2,600 documents ranging from the mid 1970s to 1988 were recovered, including approximately 100 actual security forces documents. Institutional problems found to exist included a serious lack of control over the distribution of the security forces' documents and poor recruitment and hiring practices by the UDR. As a result of the inquiry, 28 members of the UDR were arrested in August 1989. Eleven UDR soldiers were charged; all pled guilty or were convicted, including two soldiers who were convicted of theft of the documents. One ex-soldier was convicted of multiple counts of conspiracy to murder, aiding and abetting murder, collecting information, possessing documents, and possessing firearms.

7. Different problems were uncovered during the course of the Stalker and Sampson inquiries. During the Stalker investigation, the chief constable of the RUC refused to turn over a tape-recording of one of the killings of an unarmed republican. The tape had been made by British intelligence officers without the knowledge of the soldiers who killed the man. After the Stalker/Sampson report, a Mr. Kelly was invited to conduct a separate investigation and make a report. As a result of the Kelly report, 18 officers were disciplined. The discipline imposed ranged from a reprimand to a caution.

8. Witnesses on behalf of James Smyth testified to numerous instances of misconduct by the security forces in recent years:

a. Sinn Fein members are stopped and harassed on the roads in Northern Ireland by security forces.

b. Father Joseph McVey testified that he had been harassed by the security forces since shortly after he began publicizing complaints of mistreatment by the security forces.

c. Peter Caraher testified that two of his sons were shot on December 30, 1990; when Caraher tried to go to the scene, he was told by security forces that no one had been shot and was prevented from going to the scene of the shooting by a member of the security forces who held a gun to his head and threatened to shoot him if he moved. Two soldiers were charged with murder and attempted murder in connection with the shootings of Caraher's sons. Peter Caraher also testified that his home was searched about twice a year and he was taken for questioning two or three times a year. He has been searched four or five times since his sons were killed. The RUC's records show that Caraher's home has been searched seven times since 1985. Peter Caraher was never arrested.

d. Attempts were made to kill Brendan Curran in 1988 and 1989. Curran saw an RUC Land Rover near his mother's home on the night a hand-grenade was thrown at him in 1989 in his mother's house.

e. Sam Marshal was let out on bail by a court pending a criminal trial. A condition of bail was that he had to check in to a specific police station at a specified day and time twice a week. Sam Marshal was shot and killed in March 1990 within several hundred yards of the police station immediately after checking in as required.

f. Martin Finucane testified that the RUC tried to bribe him to give information about republicans, and when he refused to cooperate, the RUC threatened to tell the IRA that Finucane was an informer so the IRA would shoot Finucane. In December 1992, the RUC raided the volunteer center where Martin Finucane worked. The RUC handcuffed Martin Finucane and made him kneel or lay face down. A member of the security forces jumped on the calves of his legs to get him to reveal the names of his colleagues. Martin Finucane was not charged with a crime.

g. Patrick Finucane was a lawyer who represented accused republicans. He received death threats before he was killed in February 1989. The UFF claimed responsi-

bility for shooting and killing Patrick Finucane. Patrick Finucane was shot by a gun stolen from Army barracks by a sergeant who sold it to the Ulster Defense Association.

h. Oistin MacBride testified that he had been stopped, searched and assaulted several times by security forces. Two of the incidents took place in 1989 while he was taking pictures as a photojournalist. He filed complaints and recovered damages in both instances. Oistin MacBride also testified that he was assaulted by an RUC officer in August 1992 while taking pictures and that his home has been searched 10–20 times in the last decade.

i. Oistin MacBride's brother, John Anthony MacBride, was killed by security forces in 1984. The security forces reported that they had shot John Anthony MacBride while he was carrying out a terrorist attack. Pictures of the body of John Anthony MacBride were introduced in evidence and showed severe cuts and abrasions, with no bruising, on his face and numerous bullet holes in his head, torso, and hand.

j. In the early 1980s, Bernadette Devlin McAliskey and her husband were shot in a home invasion. The assailants broke through the front door of the house with a sledgehammer. Bernadette Devlin McAliskey was hit by seven bullets and her husband by eight bullets. Their children were not wounded in the attack. The McAliskey home had been under police surveillance shortly before the incident. The assailants were arrested coming out of the house. McAliskey testified that, while awaiting medical help, she asked a soldier why the soldiers had not stopped the intruders before they broke in the front door and the soldier told her that the soldiers' orders were only to arrest armed men coming out of the house.

9. Persons who are arrested in Northern Ireland typically make complaints about the conduct of the security forces, reportedly to explain away any confession or information given to the security forces and to generally discredit the security forces, according to the testimony of a U.K. witness.

10. RUC Detective Superintendent Robert Cooke testified that assaults occurred at the Castlereagh interrogation center in the early 1970s, but since then procedures have been implemented to try to eliminate the possibility of assaults taking place. Interrogation rooms are monitored by closed circuit television, but no audio monitoring is done, and no videotape is made. By contrast, audiotapes are made of interviews of regular criminals (i.e., those not suspected of terrorist crimes). An independent commissioner has been appointed to drop in to be sure that the prisoners are being well-treated. That commissioner divides his time among the three detention sites. The RUC's policy is that threats during interviews are illegal and subject one to discipline.

11. A person's refusal to talk at the Castlereagh detention center is considered to be a terrorist tactic, because only terrorists use the silence tactic there, according to RUC Detective Constable Damien Maguire. A right of self incrimination does exist, but for terrorist offense, the courts are permitted to draw whatever inferences they choose from a person's silence.

12. Witnesses on behalf of James Smyth noted several instances of attention to them by security forces at or near the time of the extradition hearing. The Finucane family home was raided less than a week before Martin Finucane testified. One of Peter Caraher's sons was picked up and released less than a week before Caraher testified.[4] At about the time the extradition hearing started, an RUC Land Rover parked outside the home of James Smyth's mother for about 15 minutes each night for about a week. Three days before she testified at the extradition hearing, Bernadette Devlin McAliskey was told by the RUC that she was in imminent danger of assassination. Just after James Smyth was arrested in the United States, his younger brother, Martin, was arrested in Northern Ireland.

4. Peter Caraher also stated that when he was in the United States in 1991 to speak to a Congressional delegation, soldiers stopped his family on the road, threatened them, took their pictures, and stated that the pictures would be handed over to the Ulster Volunteer Force, a loyalist paramilitary organization.

### D. *The Maze Prison.*

1. From 1971 until 1976, persons convicted of terrorist-type offenses were treated as political prisoners. These prisoners wore their own clothes, lived in nissen huts in fenced-in compounds, and were responsible for activities and discipline in their own compound. In 1976, the government removed the political prisoner status from these prisoners. This change in government policy led to hunger strikes and protests by the prisoners. Ten prisoners died in the hunger strikes.

2. The fenced-in compounds were replaced by prisons, including the Maze prison in Belfast. The Maze is a maximum security prison for prisoners who are not willing to work and obey the rules in the regular prisons. Prisoners are segregated at the Maze into republican wings (now holding about 320 republicans) and loyalist wings (now holding about 160 loyalists).[5] A prisoner may make a complaint against a prison officer, but at the time the prisoner makes a complaint, he is informed that if the investigation of the complaint determines that the allegations are false or malicious, he may be charged with an offense. Once a prisoner on a determinate sentence has served about two-thirds of his sentence, he is entitled to periods of home leave, beginning with three two-day periods, then a week, and then a few more days before the end of his sentence. Prisoners do not wear uniforms at the Maze. Prisoners form communities within their wings at the Maze and have a system of self-governance in each wing.

3. One prison official testified that the Maze prison officers' control over prisoners in unlocked situations has been usurped by the prisoners' own officer-in-command, and that prison officers feel very isolated and vulnerable. Republican prisoners make threats to guards and mention information indicating that they know about the guards' lives outside the prison walls. A prison officer also testified that in the last 12–18 months there has been an increase in the number of attacks by loyalists on prison staff inside and outside the prison.

4. When James Smyth arrived at the Maze to serve his prison term, prison officer Evans told Smyth that he could not assure Smyth's safety because of the nature of Smyth's crime (i.e., the attempted murder of a prison officer). The statement's threatening nature is evident because Smyth would face no particular danger from other prisoners because of the crime committed. Smyth's crime against a government official would not have been unpopular in the prison's republican wing. Prison officials testifying at the extradition hearing stated that they did not know whether prison officer Evans still was employed at the Maze.

5. In September 1983, 38 republican prisoners—including James Smyth—escaped from the Maze prison. The 1983 escape from the Maze was announced by the escapees to be in furtherance of their battle against the British occupation of Northern Ireland.

6. The republican prisoners who escaped but were captured and returned were forced to run a gauntlet of guard dogs which were allowed to bite them. The guards ordered attack dogs upon the republican prisoners as they were moved to other cell blocks. The dogs bit several prisoners. The prisoners were denied medical care for several days. Many of the escapees were rounded up and returned to the Maze immediately after the escape. Upon their return to the Maze, prison officers kicked and punched the returned escapees and repeatedly called them "Fenian bastards." Numerous prison officers took part in the mistreatment of the returned escapees.

7. There was no evidence that prisoners in the loyalist wing were similarly treated. That is, of the loyalist and republican prisoners who did *not* escape, only the republicans were moved, beaten, kicked, bitten by dogs, and subjected to religious and political insults.

8. Several prisoners brought actions for damages for their treatment following the escape. The court in Northern Ireland found that there was a widespread conspira-

---

**5.** The Maze also has about two dozen short-term prisoners with no political affiliation.

cy to conceal the fact of the assault of the prisoners.

9. No disciplinary action was ever taken against the prison officers for their abuse of the prisoners in connection with the escape or for perjuring themselves. The current prison governor testified that there are no plans to discipline the prison officers involved and the "case is closed" as far as he is concerned. None of the testifying prison officials knew whether any of the prison officers who participated in the abuse of the returned escapees or who perjured themselves are still employed at the Maze prison. The Maze Prison governor, John Baxter, acknowledged that many of the guards who are at the Maze now have been there since the 1983 escape.

10. Prison officers at the Maze keep the "Red Book," in which they list the trouble makers in the prison. The Red Book prisoners are considered to be high risk prisoners. All prisoners who escaped in the September 1983 escape were put in the Red Book. Red Book prisoners were moved and strip-searched more frequently than other prisoners, initially being moved every few weeks and then every few months. When John Baxter became prison governor in July 1993, the practice of moving the Red Book prisoners more frequently than other prisoners was stopped. The Red Book still exists. Prisoners who are in the Red Book have upgraded security escorts if they leave the prison for trips to the hospital or courts. The Red Book has always contained a disproportionate number of republicans. In April 1993, 9 of the 10 prisoners in the Red Book were republicans; the ratio has been as high as 18:1 republicans to loyalists. At the time of the extradition hearing, all persons in Red Book were republicans.

11. Prison officers are at risk from paramilitary organizations such as the IRA. The prison officers are very much aware that others before them have been killed by paramilitaries. They have a placque and annual memorial service at the Maze for the prison officers who have been killed.

12. Ex-prisoners from the Maze are subject to increased scrutiny by the security forces. Several witnesses on behalf of James Smyth testified that ex-prisoners are frequently subject to harassment by the security forces.

13. Sean Mackin was arrested and charged with the attempted murder of a prison officer's daughter. Mackin testified that while he was in the Crumlin Road prison before trial, he was treated differently from other prisoners in that every time an officer was killed, he would either be beaten in his cell or put in solitary confinement.

14. Six extradited persons have been imprisoned at the Maze. One prison officer stated that he is aware of only one complaint by any of them, and that was a complaint of Brendan McFarlane who complained of being moved about frequently. Four of the six extradited prisoners had taken part in the 1983 escape from the Maze. At least two of them were put in the Red Book upon their return; the prison officer was unaware what happened to the other two.

15. Paul Kane was a 1983 Maze escapee who was extradited from the Republic of Ireland to Northern Ireland in 1989. During the course of his extradition proceedings, he applied to the Minister of Justice in Ireland not to send him back because he feared being assaulted by the prison staff and members of the security forces. The Minister of Justice denied the application and guaranteed that Kane would not be abused upon his return. As soon as Kane was handed over to the security forces at the Northern Ireland border, verbal abuse, including anti-Catholic remarks, began. Once put in a holding cell in Belfast, handcuffs were placed very tightly on his wrists and despite numerous requests, the handcuffs were not removed or loosened. Kane also was roughed up by the security forces within hours of being returned to Northern Ireland.

### E. *James Smyth.*

16. The U.K. believes James Smyth is a Catholic, a republican, and a member of Sinn Fein. The U.K. has labelled Mr. Smyth a terrorist. The court declined to consider evidence as to whether or not Mr. Smyth was a member of the IRA.

17. Smyth was stopped and taken into the police station numerous times, perhaps dozens of times, before being arrested for the attempted murder of prison officer John Carlisle. His younger brother testified that it seemed as if James Smyth was arrested every 4–5 weeks for several years. He recalled that James Smyth would be held overnight and sometimes for up to three days when arrested, and would return with marks on his torso and limbs indicating physical abuse. Smyth was held in detention for a full year in 1974. The frequent arrests continued until 1977, when James Smyth was charged with the attempted murder of Mr. Carlisle. Despite being taken in for questioning frequently, Smyth was charged with crimes only once. Martin Smyth also testified that the Smyth family home was frequently searched, but no charges were ever filed as a result of anything found in the house. Disputing that the arrests were frequent, the U.K. produced records showing that Smyth had been arrested only five times, including the arrest for the attempted murder of Mr. Carlisle. The U.K.'s custodian of records admitted that records are periodically destroyed and records for certain sites could not be accessed. The lack of completeness of the U.K.'s records makes the claim that Smyth was arrested only five times questionable in light of Martin Smyth's testimony indicating a far greater frequency of arrests by the security forces.

18. In a Commission of Oyer and Terminer sitting at Belfast, Northern Ireland on December 18, 1979, James Smyth was convicted of, *inter alia*, the June 28, 1977 attempted murder of John Carlisle, a prison officer living in Belfast. The U.K. requests Smyth's extradition so that he may serve the remainder of his 20–year sentence for the offense of attempted murder.

19. If Smyth were to be extradited, he would probably return to the Maze. Prison officers were unable to state whether Smyth would receive credit for time served in the United States. One extradited prisoner, Joseph Doherty, did not receive credit for the nine years spent in United States prisons during his extradition proceedings. The current governor of the Maze, John Baxter, testified that he did not think Smyth would be put in the Red Book if returned, but he would not state what conditions would be put upon Smyth on his return.

20. Mr. Smyth is at increased risk because of his high profile. By virtue of these extradition proceedings, James Smyth has become a well-known figure in Northern Ireland. His picture and his mother's address have been published in newspapers in Northern Ireland.

21. Many witnesses opined as to whether Smyth would face discrimination, death or danger upon his return to Northern Ireland. Witnesses for the U.K. stated that he would not be in danger upon return to the Maze; witnesses for Smyth stated that he would be in danger upon return to the Maze and upon release from the Maze in Northern Ireland. Prison officer Doyle testified that Smyth would not be mistreated upon return to the Maze because prison officers are professional and also due to the prison officers' fear of retaliation if they harmed Smyth.

F. *Current Situation in Northern Ireland.*

22. There has been a marked upward trend in the number of violent crimes committed by loyalist paramilitaries in the last two years. The number of murders they committed annually doubled in the early 1990s. One witness for the U.K. stated that the UFF declared war on Catholics and republicans, especially the IRA and Sinn Fein councilors in the beginning of 1993.

23. The level of loyalist paramilitary violence is greater now than it was in 1983. There are more murders, more shootings, and more bombings perpetrated by loyalists in both absolute numbers and as a percentage of the overall terrorist incidents.

24. Witnesses for both the U.K. and Mr. Smyth opined that the loyalist paramilitary violence is expected to further increase.

25. As of the time of the extradition hearing in late 1993, there had been no deaths caused by the security forces that year.

III. *CONCLUSIONS OF LAW.*

A. *Defense to Extradition Under Article 3(a) Of the Supplementary Treaty.*

■ For over a century, international extradition practice has exempted from extradi-

tion those persons wanted for political offenses in the requesting country.[6] Several justifications for the political offense exception have been identified.

First, its historical development suggests that it is grounded in a belief that individuals have a "right to resort to political activism to foster political change." ... Second, the exception reflects a concern that individuals—particularly unsuccessful rebels—should not be returned to countries where they may be subjected to unfair trials and punishments because of their political opinions.... Third, the exception comports with the notion that governments—and certainly their nonpolitical branches—should not intervene in the internal political struggles of other nations. (*Quinn v. Robinson,* 783 F.2d 776, 793 (9th Cir.) (citations omitted) *cert. denied,* 479 U.S. 882 [107 S.Ct. 271, 93 L.Ed.2d 247] (1986).)

An increase in terrorism and international criminal activity in recent years prompted governments to rethink the desirability of the political offense exception, particularly because so much terrorism was done under the guise of seeking political change. *See* M. Cherif Bassiouni, *International Extradition* 386 (2d ed. 1987). Reevaluation of the political offense exception led to efforts in the mid–1980s to change the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, ratified in 1972.

The Supplementary Treaty was proposed by President Reagan to address the growing tide of international terrorism by excluding from the scope of the political offense exception certain violent offenses typically commit-

ted by terrorists.[7] Article 1 of the Supplementary Treaty was designed to eliminate the political offense exception for individuals accused of one of the enumerated offenses. *McMullen v. United States,* 953 F.2d 761, 765 (2d Cir.1992). The Reagan Administration's goals in submitting the Supplementary Treaty are reflected in Article 1, which reads:

For the purpose of the Extradition Treaty, none of the following shall be regarded as an offense of a political character:

(a) an offense for which both Contracting Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit his case to their competent authorities for decision as to prosecution;

(b) murder, voluntary manslaughter, and assault causing grievous bodily harm;

(c) kidnapping, abduction, or serious unlawful detention, including taking a hostage;

(d) an offense involving the use of a bomb, grenade, rocket, firearm, letter or parcel bomb, or any incendiary device if this use endangers any person; and

(e) an attempt to commit any of the foregoing offenses or participation as an accomplice of a person who commits or attempts to commit such an offense.[8]

Strong opposition greeted the proposed Supplementary Treaty when it was submitted to the U.S. Senate in 1985 for advice and consent. Most of the opposition concerned the political violence in Northern Ireland. The Supplementary Treaty quickly stalled in the Senate Foreign Relations Committee, but was revived the following year. In 1986, the

---

**6.** Political offenses are of two types: pure and relative. Pure political offenses are those subversive to a particular sovereign, including treason, espionage and sedition. Relative political offenses are common crimes committed in connection with a political act, event or motive. The term "political offense" eludes ready definition because identifying a relative political offense requires reference to the facts and circumstances surrounding the offense. M. Cherif Bassiouni, *International Extradition* 383–88 (2d ed. 1987).

**7.** *See President's Letter of Transmittal to the U.S. Senate,* 131 Cong.Rec. 22703. The Supplementa-

ry Treaty was prepared to eliminate the "political exception" to extradition in cases involving the U.K. Specifically, the Supplementary Treaty was designed to reverse the trend of cases in which U.S. courts refused to extradite purported terrorists to Northern Ireland. *McMullen v. United States,* 953 F.2d 761, 765–66 (2d Cir.1992).

**8.** The original proposed Supplementary Treaty sent to the Senate contained a longer list of exemptions. The list was trimmed during the advice and consent proceedings in the U.S. Senate.

Senate Foreign Relations Committee began negotiating a compromise for the Supplementary Treaty. *See* James T. Kelly, *The Empire Strikes Back: The Taking of Joe Doherty*, 61 Fordham L.Rev. 317, 354–60 (1992).

■ Eventually, the present Article 3(a) was added to the Supplementary Treaty to offset some of the effect of Article 1. Article 3(a) provides:

> Notwithstanding any other provision of this Supplementary Treaty, extradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality, or political opinions, or that he would, if surrendered, be prejudiced at his trial or punished, detained or restricted in his personal liberty by reason of his race, religion, nationality or political opinions.

Two distinct powers are granted by Article 3(a): (1) the courts may inquire into whether the requesting state has "trumped up" charges against the fugitive; and (2) the courts may inquire into whether the fugitive would be unfairly treated at his trial or punished, detained or restricted in his liberty because of his race, religion, nationality or political opinions. Only the latter power is implicated in the present case.

Article 3(a) departs from the traditional rule of non-inquiry in extradition matters, a rule which precludes the introduction of evidence regarding the alleged overall unfairness of the requesting country's judicial system. The rule of non-inquiry presumes that countries with which the United States has entered into extradition treaties will treat those extraditions under the treaty fairly.

*See Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 708, 55 L.Ed. 830 (1911). Article 3(a) alters the traditional rule by permitting a limited inquiry into circumstances and events in the requesting country. The scope of the inquiry permissible under Article 3(a) has been the source of considerable discussion. Several commentators suggest that the second clause of Article 3(a) applies only to the person's treatment in the judicial system.[9] Article 3(a)'s second clause is broader, however, and permits inquiry into various aspects of the criminal justice system, including searches, seizures, arrests, detentions, interrogations, and conditions of confinement as well as the proceedings at the person's trial. The sentence structure in Article 3(a) contemplates analysis of more than just the trial, as evidenced by the placement of the phrase "prejudiced at trial" before "or punished, detained or restricted." Additionally, although the concern in the U.S. Senate about the situation in Northern Ireland focused on the Diplock court system, there also was concern voiced about the security forces' behavior. *See* 131 Cong.Rec. 16,798–800 (statement of Sen. Kerry).

This court ruled before the extradition hearing began that the inquiry under Article 3(a) is "a limited one that grants to the person being sought the right to establish that he himself would be prejudiced as a result of discriminatory treatment within the requesting country's criminal justice system. This inquiry is individual and case specific." (May 6, 1993 Order, p. 6.) *Accord: In re Extradition of Howard,* 996 F.2d 1320, 1330 (1st Cir.1993).

■ Whether Article 3(a) may prevent the extradition of an alleged IRA fugitive to Northern Ireland is a question of first impression.[10]

**9.** E.g., John Patrick Groarke, *Revolutionaries Beware: The Erosion of the Political Offense Exception Under the 1986 United States–United Kingdom Supplementary Extradition Treaty,* 136 U.Penn.L.Rev. 1515, 1530 (1988); William M. Hannay, *An Analysis of the U.S.–U.K. Supplementary Extradition Treaty,* 21 Int'l Law. 925, 932 (1987); Phyllis Jo Baunach, *The U.S.–U.K. Supplementary Extradition Treaty: Justice for Terrorists or Terror for Justice?,* 2 Conn.J.Int'l Law 463, 489–91 (1987); *but see* Note, *Questions of Justice: U.S. Courts' Powers of Inquiry Under Article*

*3(a) of the United States–United Kingdom Supplementary Extradition Treaty,* 62 Notre Dame L.Rev. 474, 478 (1987) (inquiry should extend to entire justice system, including conduct of security forces).

**10.** Indeed, Article 3(a) has been addressed in few published opinions other than in this case: *In re Extradition of McMullen,* 769 F.Supp. 1278 (S.D.N.Y.1991), *aff'd McMullen v. United States,* 953 F.2d 761 (2d Cir.1992), *aff'd in part and rev'd in part sub nom, In the Matter of the Request for*

In determining whether James Smyth has established an Article 3(a) defense to extradition, immigration law regarding withholding of deportation provides a useful analogy.[11] An alien applying to the government to withhold deportation must prove by a clear probability that if returned to another country, his "life or freedom would be threatened" on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1253(h). Under the clear probability standard, the alien must show he is more likely than not to be subject to persecution.[12] In both Article 3(a) and withholding of deportation matters, the burden of proof rests on the individual.

The regulations implementing the withholding of deportation statute are instructional, and provide standards for evaluating the evidence. A showing of past persecution creates a presumption that the person's life or freedom would be threatened upon return to the country unless a preponderance of the evidence establishes a sufficient change in the conditions in the country. 8 C.F.R. § 208.16(b)(2). The regulations also provide that in evaluating whether the individual has sustained his burden of proof, the individual need not provide evidence that he would be singled out individually for such persecution if (a) he establishes that there is a pattern or practice in the country of persecution of groups of protected persons similarly situated to the applicant *and* (b) he establishes his own inclusion in and identification with such group of persons such that it is more likely than not that his life or freedom would be threatened upon his return. 8 C.F.R. § 208.16(3). In withholding of deportation cases, the individual's political opinion or religion is taken as viewed from the perspective of the alleged persecutor, regardless of whether the view is correct. *See Blanco–*

*Lopez v. Immigration & Naturalization Service,* 858 F.2d 531, 533 (9th Cir.1988).

### B. *Smyth's Article 3(a) Defenses.*

The court must make a prediction as to what will happen in the future. To do so, the court considers the evidence regarding events that occurred before Mr. Smyth left Northern Ireland, the present state of affairs in Northern Ireland, and the likely future state of affairs in Northern Ireland. Upon so doing, the court is convinced that, if extradited to the U.K., Mr. Smyth would be punished, detained and restricted in his personal liberty by reason of his status as a Catholic Irish national and on account of his political opinions as a republican and member of Sinn Fein. An Article 3(a) defense to extradition has been established in three separate and independent ways. First, the U.K. did not rebut the presumption that Smyth would face retaliatory punishment and harm upon his return to Northern Ireland. Second, even if the presumption had not been awarded, Smyth established that he would be punished upon return to prison in Northern Ireland. Third, and again without the benefit of the presumption, Smyth established that he would be punished, detained and restricted in his personal liberty upon release into the general population at the conclusion of his prison term in Northern Ireland.

### 1. *A Defense Has Been Established With the Benefit Of The Presumptions Awarded During Discovery.*

Several months before the extradition hearing, the court awarded as a discovery remedy the rebuttable presumptions that Catholic Irish nationals accused or found guilty of offenses against members of the security forces or prison officials are subjected systematically to retaliatory harm, physical intimidation and death, and that members of the security forces either participate di-

---

*Extradition of McMullen v. U.S. Court of Appeals, Second Circuit,* 989 F.2d 603 (2nd Cir.1993) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 301, 126 L.Ed.2d 249; and *In re Extradition of Howard,* 791 F.Supp. 31 (D.Mass.1992), *aff'd* 996 F.2d 1320 (1st Cir.1993).

**11.** Smyth and the UK agreed that immigration law regarding withholding of deportation may provide a useful analogy.

**12.** Asylum provides a separate basis to avoid deportation, but is not a useful analogy for Article 3(a) analysis. One must show that he will be persecuted or has a well-founded fear of persecution to be entitled to asylum. This standard is widely recognized as lower than the standard for withholding of deportation, and has a subjective component absent from Article 3(a).

rectly or tacitly endorse these actions. At the extradition hearing, it was established that Mr. Smyth was a Catholic Irish national and that the U.K. perceives him to be within the described group.

The U.K. did not rebut the presumptions. The U.K. attempted to rebut the presumptions through the testimony of John Chilcot (Permanent Undersecretary of State for Northern Ireland), Wilfred Monahan, (Assistant Chief Constable of the RUC), and Allister Irwin (a British Army Brigadier responsible for the Belfast area). These three witnesses testified that it was not the policy of the security forces to subject people convicted or accused of offenses against members of the security forces or prison officials to retaliatory harm, physical intimidation and death. However, on cross examination, the witnesses asserted "state secrets" and police investigation privileges and declined to answer questions about practices of the security forces as revealed in the Stalker–Sampson, Stevens and Kelly reports.

The U.K. cannot rebut the presumptions awarded with a simple conclusory statement that the presumption is incorrect. Evidence regarding the Stevens report illustrates the difficulty. The Stevens inquiry concluded that official information produced by the RUC, British Army and the prison service had passed into the hands of loyalist paramilitaries and that certain members of the Army colluded with loyalist paramilitaries. A published summary of the report was produced and a U.K. witness stated that most of the recommendations to prevent repetition of the problems had been implemented. The witnesses refused, however, to produce the actual report, and refused to describe the problems uncovered or to state which of the more than eighty recommendations had been implemented or how they were implemented. Without hearing the details of the magnitude of the original problems, or how the problems were supposedly solved, Smyth cannot test—and the court will not assume—the truth of the assertion that the information leaks and collusion do not persist. The witnesses' assertion of privilege interfered with Smyth's ability to cross-examine them on noncollateral matters, thereby depriving him

of a vital right under the Anglo–American system of evidence. *See United States v. Panza,* 612 F.2d 432, 438 (9th Cir.1979). Smyth orally moved that the testimony be stricken and, in a brief filed October 25, 1993, described direct testimony and the many questions asked on cross-examination that were not answered. Although these witnesses' testimony will not be stricken *in toto,* their refusal to answer questions on cross-examination impairs the ability of the factfinder to test their truthfulness and justifies the court in according the testimony less weight than it otherwise would have been given by the court.

The information contained in the reports pertains to events occurring in the 1970s and 1980s, according to the U.K. The age of the evidence diminishes its value as a predictor of future events. Nonetheless, even stale evidence may suffice to show the likelihood of future persecution, especially in light of the U.K.'s election to stand on its privilege assertion which effectively blocked the introduction of adequate evidence of changed circumstances. Moreover, the stale evidence was corroborated by substantial anecdotal evidence from which the inference that the information leaks and retaliatory harm continue.

Based on the evidence presented, with the aid of the unrebutted presumption, the court finds that James Smyth has established by a preponderance of the evidence that he will be punished, detained and restricted in his personal liberties by the security forces based on his status as a Catholic Irish national. *Cf.* 8 C.F.R. § 208.16(3). Thus, Article 3(a) of the Supplementary Treaty precludes the extradition of Mr. Smyth to the U.K.

Although the result that ultimately flowed from the U.K.'s decision to claim privilege may appear harsh, it is both necessary and appropriate. At a certain point, a government's need to protect certain information may require it to forego punishing an individual alleged wrongdoer. *Cf. United States v. Fernandez,* 913 F.2d 148, 163–64 (4th Cir. 1990) (affirming trial court's dismissal of indictment when U.S. Attorney General prohibited disclosure of classified evidence relevant to the defense).

## 2. The Treatment Smyth Will Receive When Returned To Prison in the U.K. Establishes A Defense Under Article 3(a).

Smyth's past treatment at the hands of the security forces and prison staff shows that he is likely to face discriminatory treatment if returned to prison in Northern Ireland. Smyth was frequently arrested and beaten during interrogations by the security forces for several years before being arrested for the attempted murder of Mr. Carlisle. Despite numerous arrests, numerous interrogations accompanied by beatings, numerous searches of his home, and being interned for a full year, Smyth was never charged with a crime until he was charged with the attempted murder of Mr. Carlisle.[13] The frequent law enforcement contact with Mr. Smyth—not leading to the filing of charges—leads to the conclusion that Mr. Smyth was targeted for attention not because he had committed crimes but instead because he was a known member of Sinn Fein and a republican. The evidence amply supports the conclusion that (before being charged with the attempted murder of Mr. Carlisle) Smyth was punished, detained and restricted in his personal liberties on the basis of his political opinions. The punishment included the beatings during interrogation, the detention included the numerous stops by security forces and trips to Castlereagh (a site used for interrogations of suspected terrorists) and internment, and the restrictions on his personal liberties included the denial of his right to be free from government harassment.

Once in prison, Smyth was treated worse than other prisoners because of the political nature of his crime. Smyth's life was threatened shortly after arriving at the Maze.[14] At the extradition hearing, the Maze Prison governor said that he could not offer any guarantees as to Smyth's safety upon his return to prison in Northern Ireland. The existence of a specific death threat against Mr. Smyth and the possible continued presence of the person making the death threat strongly indicate that Smyth's life is in imminent danger if returned to prison in Northern Ireland. This danger to his life is based on his political views. The prison officers may have felt personal animosity toward Smyth because he had been convicted of attempting to kill a prison officer, but that does not negate the fact that there also was animosity toward him as a suspected republican terrorist. Cf. Blanco–Lopez v. Immigration & Naturalization Service, 858 F.2d 531, 533 (9th Cir.1988) (dispute between alien and foreign government agents had personal as well as political dimensions). The guard's comment was the threat of a retaliatory killing. The prison supervisors' treatment of the threat—including failure to investigate it and a lack of knowledge as to whether the guard who stated the threat was still at the Maze—increases the risk of the retaliatory killing occurring upon Mr. Smyth's return.

Other strong evidence that Smyth will be punished based on political opinions comes from the treatment of Maze prisoners in connection with the 1983 escape. Guard dogs were ordered to attack and bite prisoners; guards beat prisoners while hurling anti-Catholic and anti-Irish insults. There was no evidence offered that any prisoners were out of control when attacked by the dogs and guards or that any actions, let alone abusive actions, were necessary to keep the prisoners under control at the time of the attacks—supporting the inference that attacks were for vengeance. The subsequent denial of medical treatment to wounded prisoners for several days and the prison officers' attempt to pervert the course of justice

---

**13.** The U.K. contends that a note uncovered in Mr. Smyth's jail cell in 1977 proves that Smyth was an IRA member. Regardless of whether Smyth was a terrorist, beating him during interrogation was not acceptable activity by the security forces, even under the standards of the EPA and PTA, and does not justify the treatment before the time the note was found.

**14.** The U.K. claims that once Smyth entered the prison system, any pattern of abuse by the security forces ended. The U.K. would have this court examine the deeds of the security forces independently and separately from the deeds of the prison officers. Such an approach is unwarranted because the propriety of the government's conduct should not depend upon the number of agencies doing the acts in question. The conduct of all government agents is examined under Article 3(a) of the Supplemental Treaty to determine whether a pattern of misconduct exists.

at trial exacerbated an already substantial problem. Even prison officers who had not physically assaulted the prisoners became involved by refusing to permit the prisoners to obtain medical care. No evidence of the discipline of any prison officer for the Maze beatings, dog bites or refusal to grant medical care to republican prisoners was introduced at the extradition hearing. According to one jurist, the purported justification for not disciplining the prison officers initially was because several claims for damages were pending. *Finucane v. McMahon*, [1990] I.R. 202, [1990] I.L.R.M. 505 (Ir.S.C.1990) (p. 21).[15] That jurist further noted that the explanation given by the government was no longer (in 1990) a plausible basis for choosing not to discipline the errant guards. The U.K. now attributes the lack of prosecution and disciplinary action against the errant prison officers to the prisoners' unwillingness to cooperate in the investigation. The continued presence of guards whose past misconduct remains undisciplined makes it highly likely that similar misconduct by the prison staff may occur in the future. Smyth will be among the victims if he returns to the Maze.

The use of the Red Book at the Maze further evidences discrimination based on political opinion. The Red Book has always contained a disproportionate number of republicans. All of the 1983 Maze escapees returned to the Maze have been put in the Red Book, and it is most likely that James Smyth will be put in the Red Book if returned. Consequences of having one's name in the Red Book include frequent moves—which disrupt a prisoner's abilities to establish a sense of community with fellow inmates and preclude participation in some educational and sports activities—and possibly a loss of early release privileges, all making prison life more difficult.

Although several persons have been extradited and imprisoned in the Maze without

incident, one 1983 Maze escapee who was extradited and returned to the Maze testified that he was verbally and physically abused as soon as he was taken within Northern Ireland's borders. The abuse continued through his return to the Maze. There is evidence that those extradited prisoners who choose to be returned to the Maze are denied credit for time served in other countries pending extradition. Normally, the U.K. does not deny credit for time served abroad, and the U.K. offered no evidence that credit is denied if a prisoner returns to a prison other than the Maze, which is the only prison which recognizes the political nature of republican terrorist crimes.

The punishment, detention and restrictions on his personal liberties that James Smyth would face upon his return to prison in Northern Ireland are adequate reasons to deny certification for extradition. The evidence presumption the court previously awarded is not necessary to and does not form part of the basis for this conclusion.

3. *The Treatment Smyth Will Receive When He Reenters The General Population Upon Release From Prison in Northern Ireland Establishes A Defense To Extradition.*

Smyth established an Article 3(a) defense to extradition by showing that, once released from prison, it is more likely than not that he will be punished, detained and restricted in his personal liberties based upon his political opinions. As described in the preceding sections, Smyth was subjected to frequent stops, arrests, interrogations, beatings and searches of his home by the security forces for years before he was charged with the attempted murder of Prison Officer John Carlisle. Mr. Smyth was subjected to this treatment because he was a known member of Sinn Fein and a republican. The past mistreatment of Mr. Smyth is a harbinger of things to come if Mr. Smyth returns to the streets of Northern Ireland.

---

**15.** During the course of the trials in Northern Ireland, the defense conceded that if a prisoner had made a request to see a doctor on September 26–29, the request would not have been granted by reason of a decision taken by the Prison Officers' Association. The governor of the Maze prison at the time thought it was unwise not to

permit the prisoners to obtain medical services and so told the Prison Officers' Association, but the Association declined to change its position. The prison governor reported the matter to the Northern Ireland Office (the U.K.'s principle governing office in Northern Ireland). No action was reported as taken.

Additionally, the likelihood of discriminatory punishment, detention and restrictions of personal liberties is greater today for Mr. Smyth than in his pre-conviction days for several reasons. The U.K. now labels Smyth as an actual terrorist rather than a suspected terrorist. Smyth is much more recognizable today because in the course of these extradition proceedings he has become well-known in Northern Ireland. His high profile as a Sinn Fein member, a republican and an ex-prisoner from the Maze increases the chances that he will be the focus of attention from the security forces, including frequent stops, detentions, and occasional interrogations and beatings at the Castlereagh detention center. Upon their release, republican ex-prisoners are frequently stopped, detained and questioned in the streets of Northern Ireland; some members of the security forces think the republican ex-prisoner status alone justifies stops, detentions and interrogations. This conduct by the security forces has not changed in the last several years. The U.K. maintains that whatever misconduct occurred in the past is no longer a problem because procedural safeguards are now in place, but the court remains unconvinced that the security forces' conduct has changed so as not to warrant deep concern about the way Mr. Smyth will be treated once he returns to civilian life in Northern Ireland.

The U.K. argues that the court should not consider what will happen to Mr. Smyth upon his release from prison because it will end the government's punishment of Smyth and will occur five years hence. The court's inquiry properly includes the treatment Mr. Smyth will receive at the hands of the security forces on the streets as well as at the hands of the prison officers while in prison. A closer call is presented because of the time delay before Smyth returns to the civilian population. It is likely that Smyth will not be freed for five years, but he may be freed sooner if he is given credit for almost two years spent in American prisons. Also, Smyth may be temporarily in the civilian population earlier than his actual release date from prison because in Northern Ireland there is a system of short paroles for persons nearing the end of their sentences.

Although it is not necessary for the court to be satisfied that the person will live without interference for the remainder of his life, the danger a person faces need not be a danger likely to materialize immediately upon his return to the foreign country. Circumstances in a foreign country may change over time, but the court will not make the prediction that significant changes will occur that will eliminate a present danger in determining whether to certify a person for extradition.

The U.K. contends that Smyth can avoid any persecution by moving out of the Ardoyne neighborhood. This is not a solution. The evidence showed that republicans in different parts of Northern Ireland were subjected to similar treatment by the security forces. Also, leaving Northern Ireland entirely may not be an option because Smyth may be subject to an exclusion order barring him from other countries in the U.K. and probably would be unwelcome in other countries because the U.K. officially identifies him as a terrorist.

Arrests, detentions and interrogations likely to occur because of Smyth's status as a Catholic Irish national, a republican, and a Sinn Fein member—rather than because he is suspected of committing a crime—are detentions within the meaning of Article 3(a). The beatings Smyth is likely to receive during those politically motivated arrests and interrogations constitute punishment within the meaning of Article 3(a).

The punishment, detention and restrictions on his personal liberties that James Smyth would face upon his reentry into the general public upon his release from the Maze are adequate reasons alone to deny certification for extradition. A separate and independent defense to extradition exists based on the detention and restriction on personal liberties James Smyth will face upon his release from the Maze into the general population in Northern Ireland.

### DISPOSITION

The request for the certification of the extradition of James Joseph Smyth is DENIED.

Any finding of fact or conclusion of law stated herein which may be considered to be the other is deemed to be such.

IT IS SO ORDERED.