72 F.3d 1433
 96 Cal. Daily Op. Serv. 146, 96 Daily Journal
D.A.R. 237
In the Matter of the Requested EXTRADITION OF James Joseph SMYTH.
UNITED STATES of America, Plaintiff-Appellant,
v.
James Joseph SMYTH, Defendant-Appellee.
 No. 94-10495.
 United States Court of Appeals,
Ninth Circuit.
 Jan. 5, 1996.
 
 Prior report: 61 F.3d 711 (1995).
 Before: SNEED, SCHROEDER, and FERGUSON, Circuit Judges.
 
 
 1
 Dissent by Judge NOONAN; Dissent by Judge REINHARDT.
 
 
 2
 The panel has voted to deny appellee's petition for rehearing and to reject the suggestion for rehearing en banc.
 
 
 3
 The full court was advised of the suggestion for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes in favor of en banc consideration. Fed.R.App.P. 35.
 
 
 4
 The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.
 
 
 5
 NOONAN, Circuit Judge, dissenting from failure to take en banc, with whom Circuit Judges PREGERSON, REINHARDT and O'SCANNLAIN join:
 
 
 6
 1. The Article II Appellate Court. This case presents an issue of unusual significance for the Judicial Branch of the government: if a court of appeals established under Article III erroneously believes that it may and must act as an Article II court, and does so act, what is the validity of its decision?
 
 
 7
 This issue is posed by the panel decision in this case. The panel proclaims that it has jurisdiction of the appeal because of the Supplementary Treaty between the United States and the United Kingdom (hereafter the Treaty), Article 3(a). Matter of Requested Extradition of Smyth, 61 F.3d 711, 713 (9th Cir.1995). The panel goes on to declare "the rules of evidence and civil procedure that govern federal court proceedings heard under the authority of Article III of the United States Constitution do not apply in extradition hearings that are conducted under the authority of a treaty enacted pursuant to Article II. Cf. Fed.R.Evid. 1101(d)(3)." Id. at 720-721. The reference is to the proviso that the Federal Rules of Evidence are inapplicable to proceedings for extradition. The proviso, however, makes no reference to the applicability of the Rules of Civil Procedure to extradition proceedings. Rule 1 of the Federal Rules of Civil Procedure states: "These rules govern the procedure in the United States district courts in all suits of a civil nature whether cognizable as cases at law or in equity or in admiralty, with the exceptions stated in Rule 81. They shall be construed to secure the just, speedy, and inexpensive determination of every action." Rule 81 contains no exception for extradition. The Federal Rules of Civil Procedure govern an Article III court in such a case. The panel thought otherwise. As it believed that the proceedings were under Article II, neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure were operative in the district court. By the same token, the panel acted as though it was itself an Article II court.
 
 
 8
 Doing so, the panel misconceived its functions, misinterpreted the Treaty, and put the Ninth Circuit in direct conflict with the First Circuit. The latter court had earlier occasion to interpret the Treaty and to review the history of extradition proceedings. Past practice and precedent held that there was no direct appeal from an extradition order by either the extraditee or by the United States. See In re Extradition of Howard, 996 F.2d 1320, 1325 (1st Cir.1993). The extradition officer was not exercising any part of the judicial authority of the United States. Therefore an unbroken line of precedents held that there could be no direct appeal from this officer's order to an Article III court. Id.
 
 
 9
 The Treaty "effects a sea change in established policy." Id. at 1326. The government in Howard objected, "imploring that neither the President nor the Senate intended to work so abrupt a tergiversation." Id. The First Circuit was inexorable in its reading of the Treaty. Article 3(b) provided that a finding anent an Article 3(a) defense "shall be immediately appealable by either party to the United States district court, or court of appeals, as appropriate." The language of the Treaty was intended to invoke the judicial power of the United States, that power possessed only by an Article III court. Id. With that power in mind, the Treaty in Article 3(b) specifies that "the Federal Rules of Appellate Procedure or Civil Procedure, as appropriate, shall govern the appeals process." In short, the Treaty makes "a clean break from the ancient prohibition on direct appeals in extradition matters; .... it unlocks the gate which has historically barred extradition matters from proceeding further through the federal courts in the same manner as other cases." Id.
 
 
 10
 Although the panel in our case was aware of Howard and actually cited it, 61 F.3d at 713, it did not adopt its analysis. The panel acted as an Article II court reviewing the decision of an Article II court. This fundamental misconception tainted all its deliberations. The appropriate remedy for this mistake is vacation of the court's judgment so that the court may address all the issues aware that it is performing the duties of an Article III tribunal.
 
 
 11
 In Howard, the government lost the argument for Article II standards and Article II jurisdiction and absence of appeal to an Article III court. It has the benefit of Howard now in taking this appeal. Not as a matter of estoppel, but as a matter of consistency and fairness, the government should accept Howard in its entirety and acknowledge error when the court of appeals conducts itself as a creation of Article II.
 
 
 12
 The court's fundamental misconception also distorted particular rulings of the court as set out more fully in what follows.
 
 
 13
 2. The Factfinding Appellate Court. As an Article II court, the panel believed itself liberated from precedent. Freed from this burden, the panel found itself empowered to do its own factfinding and free to disregard accepted practice as to the ascertainment of future facts.
 
 
 14
 Without referring to any standard of review the panel ignored some of the factual findings of the district court, set aside others and even occasionally supplied its own facts. For example, the panel resolved the conflicting testimony as to conditions in the Maze and held (1) that the "strongest evidence of post-return politically motivated mistreatment" was "that the guards yelled racist and religious epithets while mistreating Smyth's fellow Maze escapees who were returned a decade ago." Matter of Requested Extradition of Smyth, 61 F.3d at 722.
 
 
 15
 This example of appellate factfinding suffers from several defects. The guards did not yell "racist" epithets. "Racist epithets" is a phrase atavistically echoing the colonial past. Use of the phrase suggests that the panel in its imaginative factfinding was out of touch with modern Belfast.
 
 
 16
 Race is not an issue in this case. Nationality is. The district court did not cite this evidence to show "politically motivated" misconduct but animus on religious and national identity grounds. The panel not only missed the point but conveniently separated the yelling of epithets from the physical attack accompanying them, so that the abuse appears merely verbal rather than integrated with the infliction of bodily injury on the returned prisoners running a gauntlet of attacking guard dogs.
 
 
 17
 Having misstated Smyth's evidence, the panel then weighed other testimony pointing to improvement in conditions at the Maze. Entirely omitted from this factfinding was any reference to the district court's expressed scepticism about the relevant United Kingdom testimony and any reference to the district court's finding that the same guards who had staged the dog attack, left the prisoners' wounds unattended, and engaged in a cover-up, had been unpunished and were a "continued presence" at the prison. In the Matter of the Requested Extradition of Smyth, 863 F.Supp. 1137 at 1153-1154 (N.D.Cal.1994). Without holding any of these findings to be clearly erroneous, the panel ignored them and made its own findings that there was not sufficient evidence that Smyth would be punished in the Maze on a forbidden ground. 61 F.3d at 722.
 
 
 18
 Besides misstating and ignoring facts found by the district court, the panel did not acknowledge (1) that inference from past conduct to future behavior is a common method of reasoning in our legal system and (2) that inference-drawing is a type of factfinding, a process by which the presence of one fact leads to a probable estimate of a second fact. Instead, the panel spoke of the district court making an unwarranted "presumption" on the basis of the past misconduct. Id. at 720.
 
 
 19
 The Supreme Court has observed that prediction based on past experience is "performed countless times each day throughout the American system of criminal justice." Jurek v. Texas, 428 U.S. 262, 276, 96 S.Ct. 2950, 2957-58, 49 L.Ed.2d 929 (1976). It is a task performed by triers of fact, such as juries. Id. When an appellate court decides to substitute its inferences for those reached by the trial court, it must have some basis for finding the trial court clearly erroneous and some basis for preferring its own findings. The panel did not say how the district court erred factually or why its own factfinding is superior.
 
 
 20
 The above observations apply to the panel's treatment of the evidence showing that Smyth will be mistreated in prison on the grounds of religion, nationality and political opinions. They also apply to the panel's treatment of the district court's finding that Smyth would be subject to punishment by the security forces after his release from prison on the same grounds. The panel stated: "There was, however, little such evidence. Nearly all of the testimony of harassment of Republican ex-prisoners concerned conduct that occurred in the past." 61 F.3d at 719. The panel then faulted the district court for relying on more general evidence of "discriminatory effects of the Diplock system upon Catholics and suspected Republican sympathizers." Id. at 720.
 
 
 21
 In this effort at factfinding, the panel ignored the district court's finding that Smyth's probable persecution by the security forces after his release would be on the basis of his political opinions as well as on the basis of his nationality and religion. The panel again resolutely refused to use past experience as a predictor of future behavior.
 
 
 22
 The panel also made a harmful factual finding about Smyth, and that is that he is a member of the Irish Republican Army. Id. at 713. There are about 400 members of the IRA, In the Matter of ... Smyth, 863 F.Supp. at 1140. To be a member is a crime in the United Kingdom, Id. at 1142. Smyth has been neither convicted nor charged with such membership. The district court explicitly refused to consider evidence tendered by the United Kingdom to establish Smyth's membership. Id. at 1147. There is nothing in the record to support the panel's finding of membership. The error was called to the panel's attention by Smyth's petition for rehearing. In response the panel has amended its opinion after the taking of the en banc vote. The amendment to 61 F.3d 711 at 713 changes the finding of fact as to Smyth to read: "The Provisional Irish Republican Army (IRA) of which Smyth reputedly is a member has publicly announced that the British Army and persons who work for the Army are targets." In other words, the panel no longer identifies Smyth as a member of the IRA but as a person who is reputed to be a member of the IRA.
 
 
 23
 The initial finding of membership in the IRA was done parenthetically and casually with little thought to the probable consequences of the finding. The panel continues to show extraordinary insensitivity in finding Smyth possessed of reputation of membership in an organization that is not merely criminal in the United Kingdom but is regarded by many persons in that country with fear and loathing, so that the imputation of reputation is calculated to extinguish compassion and inflame hostility to a man so reputed.
 
 
 24
 The reputation of being a criminal is as much a fact as being a criminal. The panel amendment no longer goes to the extreme of convicting Smyth of a crime of which he has not even been charged in the United Kingdom. The panel still makes a factual determination that Smyth has the reputation of being a member of this organization that is criminal in the United Kingdom. Reputation is not an attribute in the air. When one is "reputedly" guilty of criminal conduct, it is always reputedly according to some person or group. The harm done by the panel's baseless factual finding is intensified because the panel does not identify the source or sources from which it derives this fact. As the district court would permit no evidence on the point, the source or sources cannot be the record in the district court. The government on appeal to this court made a vigorous attack on the district court excluding evidence that might have established Smyth's IRA membership. The panel did not hold that the district court had erred in its exclusion. What the panel has done is to accept the district court's ruling and yet subvert the effect of the ruling by taking cognizance of the government's objection to the ruling and importing into the panel's own opinion some of the allegations that the government sought to support by evidence which the district court excluded. No precedent is cited for such treatment of a district court's ruling on the exclusion of evidence on a point of major significance to Smyth on his return to prison. The panel as an Article II court did not believe that it had need of precedent for its novel action.
 
 
 25
 3. The Toothless District Court. Federal Rules of Civil Procedure 37 authorizes the district court to apply "appropriate sanctions" for failure to comply with the court's discovery orders. We have held that appropriate sanctions may include dismissal of a case. Henry v. Gill Industries, Inc., 983 F.2d 943, 946 (9th Cir.1993).
 
 
 26
 On request for discovery by Smyth the district court ordered the United Kingdom to produce three governmental reports on grave misconduct, motivated by religious, national and political bias, by the security forces in Northern Ireland. One of the reports was the Stalker Report, notorious in Britain because its author, a high-ranking British police officer, himself became the object of police persecution after his report setting out such misconduct. The district court found Smyth's need for the three reports to be strong and the United Kingdom's declaration invoking privilege to be vague. The United Kingdom declined the court's invitation to redact the reports to protect the identities of the security force members involved. The United Kingdom refused to produce the reports. In the Matter of ... Smyth, 863 F.Supp. 1137, at 1139. Accordingly, the district court created the two rebuttable presumptions shifting the burden of production and invoked those presumptions in addition to the other evidence to uphold one of Smyth's contentions, that he would be harmed by the security forces on the basis of being Catholic and Irish.
 
 
 27
 The panel denied the district court's authority to impose this sanction. The panel stated:
 
 
 28
 In so doing, the district court improperly shifted the burden of proof from Smyth to the government in contravention of the treaty provision. See Supplementary Treaty, art. 3(a) ("extradition shall not occur if the person sought establishes ... by a preponderance of the evidence....") 61 F.3d at 721.
 
 
 29
 The panel thus took the position that the Treaty prevents the district court from enforcing its orders by a shift in the burden of proof.
 
 
 30
 There is not a word in the Treaty that requires the district court to abandon its normal prerogative of enforcing its orders by such sanctions as are appropriate. The holding of the panel is a serious and entirely illegitimate restriction on the power of the district court to make litigants in an extradition proceeding conform to its orders. The Treaty was misinterpreted. More serious still, the Federal Rules of Civil Procedure were treated as inapplicable in the district court proceeding. Rule 37 was rendered null. The district court was improperly impeded in its functions. The Federal Rules of Civil Procedure could no longer work "to secure the just ... determination" of the action.
 
 
 31
 4. The Politically-Balancing Appellate Court. The panel further misinterpreted the Treaty. The panel held:
 
 
 32
 We reverse the district court because we hold that the record does not establish by a preponderance of the evidence that this extradition will lead to detention and punishment on account of Smyth's race, religion, nationality, or political opinions rather than on account of his conviction for attempted murder. 61 F.3d at 713.
 
 
 33
 In so holding, the panel interpreted Article 3(a) to forbid extradition only if the extraditee's probable punishment would be exclusively based on one of the four forbidden factors and not also on the crime of conviction. So ruling, the panel eviscerated Article 3(a).
 
 
 34
 The Treaty makes extraditable those persons connected to major crimes of violence and then says in Article 3(a) that "extradition shall not occur" if the Article 3(a) defense is established. In every case the person invoking the Article 3(a) defense will be either convicted of, or charged with, one of the major crimes. There is no way that an extraditee can prove conclusively that the punishment he is likely to receive will be exclusively on account of one of the four forbidden factors. There will always be the likelihood that some members of the security forces will have the private motivation of seeking to punish him extralegally for the crime of conviction. The possibility that such a private motivation for punishing Smyth may exist should not lessen the force of his proof that his punishment will be because he is perceived by the security forces as a Catholic, an Irish national, a Republican and a member of the Sinn Fein. The panel, however, sets aside all of the evidence found by the district court to predict such discriminatory punishment and holds it insufficient so long as the punishment may also be for the attempted murder.
 
 
 35
 The punishments that the district court found probable were torture and death in prison and arbitrary stops, detentions and interrogations if he survived prison. In the Matter of ... Smyth, 863 F.Supp. at 1153, 1155. All of these punishments are extralegal; none of them is the prescribed punishment for Smyth's crime. Yet because the panel believed that these extralegal punishments might be motivated by Smyth's crime, the panel stripped him of his Article 3(a) defense. The result is an individual injustice and a startling precedent.
 
 
 36
 To reach this result the panel took upon itself a kind of political balancing appropriate for the Executive Branch and inappropriate for the Judicial Branch. The panel's misconception of itself as an Article II court no doubt accounts for this exercise in political wisdom. The posture in which the panel has put the case actually serves to underscore the proper responsibilities in these proceedings of the Executive Branch. The United Kingdom is not a party before this court. It is the United States, represented by the Department of Justice, that has interpreted the Treaty, sought Smyth's extradition, and appealed Judge Caulfield's order denying it. In making these significant decisions the Executive Branch has exercised discretion, a discretion not only affected by legal considerations but by political considerations. The Executive Branch has necessarily had its eye on relations between the United Kingdom and the United States. If, as appears likely, Smyth seeks a writ of certiorari from the Supreme Court of the United States, the Executive Branch must again exercise a discretion which is both legal and political in determining whether to defend the judgment of the panel or to concede error and accept the reasoned judgment of the district court.
 
 
 37
 I concur in Judge REINHARDT's dissent, which explores in depth the failure of the panel to follow precedent, to uphold the sanctions imposed by the district court, and to interpret the Treaty as it is written.
 
 
 38
 REINHARDT, Circuit Judge, dissenting from failure to take en banc, with whom Circuit Judges PREGERSON, NOONAN, and O'SCANNLAIN join:
 
 
 39
 I join in Judge NOONAN's dissent from the court's failure to take this case en banc because I am in general agreement with it. However, I write separately in order to point out several additional errors in the panel's opinion that are equally or more serious. Judge Noonan explains convincingly why the panel is mistaken when it concludes that the district court erred in its imposition of rebuttable presumptions because they "improperly shifted the burden of proof from Smyth to the government in contravention of the treaty provision." I see a further fundamental error, which is at least as serious, in the panel's analysis of those presumptions. The panel is just plain wrong, and inexplicably so, when it asserts that the presumptions "do not directly address that prong of Article 3(a) requiring the person sought for extradition to establish that the retaliation or detention would be on account of 'race, religion, nationality or political opinions.' " Matter of the Requested Extradition of Smyth, 61 F.3d 711, 717 (9th Cir.1995). The language of the first presumption imposed by the district court belies this statement. That presumption reads as follows:
 
 
 40
 Catholic Irish nationals accused or found guilty of offenses against members of the security forces or prison officials are subjected systematically to retaliatory harm, physical intimidation and death in Northern Ireland.
 
 
 41
 Matter of Requested Extradition of Smyth, 863 F.Supp. 1137, 1151-52 (N.D.Cal.1994) (emphasis added).
 
 
 42
 I suppose that the district court might, conceivably, have been a bit clearer when it drafted the presumptions, as most of us could be whenever we write opinions or author other judicial or legal writings. The presumption might have read, "Catholic Irish nationals accused or found guilty of offenses against members of the security forces or prison officials are, on account of their religion and/or nationality and their political opinions, systematically subjected to retaliatory harm, physical intimidation and death in Northern Ireland." Even without these unnecessary words however, the meaning of the presumption is absolutely clear--Catholic Irish nationals who are believed to have committed acts of violence against certain persons they consider oppressors are systematically subjected to retaliatory harm, physical intimidation and death because of their nationality, their religion, and the political nature of the acts they are believed to have committed. To put it differently, the obvious and unambiguous meaning of the presumption is that a subset of Catholic Irish nationals, those believed to have committed politically motivated crimes, are systematically retaliated against in a harsh and unlawful manner--in the words of Article 3(a) of the Treaty, "on account of [their] race, religion, nationality or political opinions."[1]
 
 
 43
 For the panel to read the presumption any other way amounts to a flagrant disregard of its clear meaning as well as an unwarranted insistence on pedantry. Clearly the panel's opinion imposes an unreasonable standard on district judges, one that not surprisingly is not reflected in the panel's own product. Following the panel's approach, the statement "under Hitler, Jews in Germany were systematically subjected to enslavement and execution," would not mean that Jews were persecuted on account of their religion.[2] The inclusion of the word "Jews" would be a mere extraneous detail, unless the writer added, superfluously, that Jews were persecuted on account of their religion. Similarly, if the district court had imposed the rebuttable presumption that "before the Civil War, African-Americans were systematically sold into slavery and subjected to barbaric treatment," the panel would not find that presumption to mean that the horrific treatment was on account of race.
 
 
 44
 I also disagree strongly with the panel's contention that the district court erred by "relying extensively upon evidence of the general discriminatory effects of the Diplock system upon Catholics and suspected republican sympathizers [because t]hat evidence does not relate to the treatment Smyth is likely to receive as a consequence of extradition." Id. at 720. Beginning with a comparatively minor point, it is unclear why the panel seems to have assumed that the district court was relying principally upon evidence regarding the implementation of the Diplock system.[3] When it discussed the evidence upon which it was relying, the district court barely mentioned Diplock, and then only in the most casual terms. Instead, the district court relied on a wide range of evidence, including the past treatment of Smyth himself, the treatment of Catholic Irish nationals in the Maze, the prison from which Smyth fled and to which he will most likely be returned,[4] and the treatment generally of Irish Catholic nationals who are believed to be republican sympathizers, generally. Smyth, 863 F.Supp. at 1148 and 1153. I will assume therefore that the panel is really criticizing the district court's reliance on the evidence on which it actually relied, and particularly the evidence of general discriminatory harsh, and extra-legal treatment of Irish Catholic nationals believed to be republican sympathizers--some but not all of whom committed, or were believed to have committed, offenses similar to the one committed by Smyth.
 
 
 45
 On a more substantive point, the panel mistakenly implies that because the district court relied on more general evidence, it failed to make, or rely on, sufficient findings specific to Smyth. In fact, the district court made a number of findings relating specifically to Smyth, which findings directly support its conclusion that Smyth had succeeded in establishing a defense under Article 3(a) of the Treaty. For example, the district court found:
 
 
 46
 Smyth was frequently arrested and beaten during interrogations by the security forces for several years before being arrested for the attempted murder of Mr. Carlisle. Despite numerous arrests, numerous interrogations accompanied by beatings, numerous searches of his home, and being interned a full year, Smyth was never charged with a crime until he was charged with the attempted murder of Mr. Carlisle. The frequent law enforcement contact with Mr. Smyth--not leading to the filing of charges--leads to the conclusion that Mr. Smyth was targeted for attention not because he had committed crimes, but because he was a known member of Sinn Fein and a republican. The evidence amply supports the conclusion that ... Smyth was punished, detained and restricted in his personal liberties on the basis of his political opinions.
 
 
 47
 Id. at 1153. The district court also cited an implicit death threat by a prison official against Smyth while he was in the Maze, and the beatings inflicted, in the Maze, upon other republican prisoners, who like Smyth had escaped from the Maze, upon their recapture and return to the prison. Id. at 1146, 1153.
 
 
 48
 My objection to the panel's methodology goes far beyond its total disregard of the district court's fact-finding and its wholesale rejection of Judge Caulfield's thorough, carefully written and analytically-correct opinion. By refusing to recognize the importance of the evidence about the general treatment of Catholics or republican sympathizers, including those who are suspected or convicted of crimes intended to impede or undermine the British forces or its policies, the panel's decision threatens the ability of any defendant, no matter how deserving, to mount an Article 3(a) defense. The panel said that such evidence "does not relate to the treatment [a particular person resisting extradition] is likely to receive ..." Smyth, 61 F.3d at 720. That is simply incorrect.
 
 
 49
 Defenses under Article 3(a) are predicated on a showing that defendants will be punished or will receive additional or extra-legal punishment on account of their affiliation with a particular religion, their membership in a certain race, or their adherence to a particular political opinion. Evidence about how other members of that race or religion or others holding that same political opinion (some of whom have been accused of crimes of violence against the British or their allies and some of whom have not) are treated is highly probative with respect to how a specific member of that race or religion or a specific individual holding that political opinion will be treated if he is extradited and imprisoned for a politically-motivated violent offense. But according to the panel's reasoning, at least as I understand it, if Smyth had showed by irrefutable evidence that 90% of all Catholic Irish nationals were tortured, it would be of no relevance to his defense.[5] To me that makes no sense at all. Moreover, the relevance is even clearer when we are examining the question of retaliation against a subset of the group--the subset that the retaliators are most likely to take action against--those who commit or are suspected of having committed politically-motivated violent offenses. Certainly, an individual fighting extradition need not rely solely, or in some cases at all, on evidence of his own past persecution. Here, the claim is that British forces retaliate against and punish extrajudicially the entire subset of which Smyth is a member. Evidence to that effect specifically, as well as evidence of discriminatory treatment of Catholic Irish nationals generally, is indeed highly probative in the case before us.
 
 
 50
 Would the panel really require that a district court ignore all evidence of intentional systematic discrimination against African-Americans in an equal protection case and force an African-American plaintiff to rely solely on evidence that he himself had been discriminated against on account of his race? Under the panel's rationale, many defendants who have more than sufficient reason to fear retaliation would be unable to mount a successful Article 3(a) defense without specific evidence that the security forces had come to them in advance and announced, "We intend to torture you because you are a Catholic or a republican or both." In fact, the panel's reasoning would render the Article 3(a) defense a virtual nullity in most cases in which it is intended to be applicable under the Treaty.
 
 
 51
 The panel's interpretation of the Treaty is also inconsistent with the interpretation given the analogous United States law governing asylum and withholding of deportation, which provides that "[t]he Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." INS v. Cardoza-Fonseca, 480 U.S. 421, 429 n. 9, 107 S.Ct. 1207, 1212 n. 9, 94 L.Ed.2d 434 (1987) (quoting 8 U.S.C. Sec. 1253(h)(1)). Although the language of Article 3(a) is remarkably similar to that in 8 U.S.C. Sec. 1253(h)(1),[6] the panel's interpretation of the language of the Treaty is radically different from the interpretation of the asylum and deportation provisions set forth in the governing regulations. A person applying for asylum or withholding of deportation can sustain his burden of showing that he will be persecuted by demonstrating membership in a protected group and a "pattern or practice ... of persecution of groups of persons similarly situated to the applicant on account of race, religion, nationality, ... or political opinion." 8 C.F.R. Sec. 208.13(b)(2)(i)(A) & (B). If the applicant makes such a showing, he need not "provide evidence that he would be singled out individually for persecution." 8 C.F.R. Sec. 208.13(b)(2)(i). We have stated forcefully that "the INS's views as expressed in th[ese] regulation[s] are patently correct." Kotasz v. INS, 31 F.3d 847, 853 (9th Cir.1994). Under the panel's view, however, similar evidence would appear to be inadmissible on the ground that "it does not relate to the treatment [the person being extradited] is likely to receive." Smyth, 61 F.3d at 720.
 
 
 52
 In some cases, persecution of an entire group is so pervasive that proof of membership in that group is sufficient in and of itself to demonstrate a well-founded fear of future persecution. For example, regardless of what the panel might think, a Jew in Nazi Germany would not have needed to show any evidence of "individual targeting" in order to show a likelihood of persecution. See Kotasz, 31 F.3d at 852. In other cases, membership in a broad group is insufficient, standing alone, to meet the burden, even if a large number of members of that group have been persecuted. Id. We have stated that "despite widespread political violence that existed in El Salvador ... neither all Salvadorans nor all rebel sympathizers were systematically persecuted on account of race, religion, nationality, membership in a particular social group or political opinion." Id. We have added, however, that the fact of widespread political violence plays a significant role in our determinations in non -pattern or practice cases.[7] See Id.; Zavala-Bonilla v. INS, 730 F.2d 562, 564 (9th Cir.1984); Cf. Bolanos-Hernandez, 767 F.2d 1277, 1283 n. 11 (9th Cir.1984).
 
 
 53
 The principles that govern the analogous portions of asylum and deportation law should be applicable in extradition proceedings. I see no justification for a different approach to determining when an individual who belongs to a "suspect" group is in danger of being subjected to unlawful treatment on account of his affiliations or beliefs. In the case before us, the group identified as subject to systematic persecution is not as broad as the Jews in Germany; it is not all Irish Catholic nationals. Rather, it is a subset of that group: it is all Irish Catholic nationals believed to have committed certain crimes that are politically motivated. Because Smyth is a member of that subset, evidence of how his fellow members are systematically treated would be, as in a deportation case, highly relevant to how Smyth will be treated. While evidence of widespread retaliation against Catholic Irish republicans generally would not necessarily be sufficient, one would think that the panel would at least have recognized that such evidence is most probative as to any individual in Smyth's circumstances. See, e.g., Zavala-Bonilla, 730 F.2d at 564.
 
 
 54
 It should be remembered at this point that although the panel was wrong to disregard the evidence regarding retaliatory treatment of Catholic Irish nationals generally, Smyth was entitled to prevail without that evidence, as well as without the more specific evidence he submitted regarding retaliatory actions taken against others at the Maze prison, and even without the evidence that he, himself, had previously been beaten and physically abused. The presumptions that the district court imposed, when a) unrebutted and b) given their proper force and effect are in themselves sufficient under the Treaty to require a court to deny an extradition request.[8] Although the presumptions were, under the district court's order, rebuttable, the British government (through the United States) provided no evidence designed to serve that purpose.
 
 
 55
 I set forth the two presumptions below.[9] They establish that members of the security forces directly participate in or condone actions that collectively constitute systematic retaliation against Catholic Irish nationals accused or found guilty of the types of offenses of which Smyth was convicted, and that the retaliatory treatment occurs in the form of physical intimidation and death. As in the case of asylum and withholding of deportation, such a finding, or in this case such an unrebutted presumption, should serve in itself to compel denial of an extradition request and preclude public officials from sending an individual back to his native land to face torture or execution. See supra, notes 3-5 and accompanying text. Had the panel not erroneously concluded that the presumptions resulted in improper burden-shifting, and that they failed to address the issues of religion, nationality, or political opinions, it would have been compelled for this reason alone, to uphold the district court's denial of the request for certification of the writ of extradition.
 
 
 56
 Finally, the panel errs by drawing a rigid and artificial dichotomy between being punished on account of political or religious beliefs and being punished on account of the crime committed.
 
 
 57
 Smyth would have to demonstrate by a preponderance of the evidence that the criminal justice system in Northern Ireland likely would exact additional retribution for his crime beyond the remaining term of imprisonment, and that such additional punishment would be inflicted on account of Smyth's political or religious beliefs, and not on account of his having attempted to murder a prison guard. This is a difficult burden and one which Smyth did not shoulder successfully.
 
 
 58
 Smyth, 61 F.3d at 720. The panel's statement suggests that retribution or extra-legal punishment, including beatings and torture, is inflicted solely because of a defendant's political or religious beliefs or solely because of a crime the defendant is charged with, and that we can readily separate the two elements. I strongly disagree.
 
 
 59
 The reality is that in certain types of cases we simply cannot separate the crime from its political elements or separate the political opinions of the person who commits the crime from the crime itself; nor, often, can we separate the identity of the victim from the particular crime or from the political opinion that led to it. If a republican sympathizer shoots a security guard in retaliation for the death of another republican sympathizer, there is a political element to the crime which is lacking when a robber shoots a security guard in the course of committing an ordinary bank robbery. A crime of violence committed against a British soldier, operative, or agent is more likely to be politically motivated than is a similar crime against an ordinary Irish citizen. If two defendants receive life sentences for murder, and the republican sympathizer who killed a British soldier is beaten regularly by the prison guards, while the other prisoner who killed his adulterous wife is not, the first convict is almost certainly the victim of unlawful retaliation on account of his political opinions. However, it is equally true that he is being retaliated against on account of the crime he committed. The first defendant's political opinion is inextricably intertwined with his crime, and his crime is an expression or implementation, however improper, of his political opinion. Thus, when a Catholic Irish national kills or wounds a member of the British security forces or explodes a bomb in a restaurant or railroad station and kills several dozen innocent people, it is ordinarily the nature of the crime, the political nature, that precipitates the violent retribution or the additional punishment.
 
 
 60
 To offer another example, it may be a crime to deface or destroy public property. Thus, toppling statues in public parks is forbidden. But toppling a memorial statue to British soldiers slain in Belfast may have a different meaning from toppling a statue of a Seamus Heaney. Similarly, toppling statues as part of a Sinn Fein campaign to destroy public property and create public turmoil is not the same generally as a drunken vandal's destruction of a statue for "fun." In the politically-motivated cases of statue-toppling, it would be equally accurate to say that the individual defendant is being subjected to additional punishment on account of his political beliefs or on account of the crime he committed. When a crime is politically motivated, there is in fact no difference between the two. Yet under the panel's approach, the choice of characterizations would determine whether or not an individual was entitled to invoke an Article 3(a) defense to extradition.
 
 
 61
 To say that Smyth must prove that he will be subjected to additional punishment solely on account of political beliefs and not because he committed a particular crime is, according to the panel, "a difficult burden;" in fact, it is an impossible one. The panel's conclusion results from its misinterpretation of the Treaty. It creates a false dichotomy, one that is wholly unreal. In the black and white, all or nothing, world of the panel's opinion, there is the crime and the political opinion and never the twain shall meet. The truth however is that the two are inextricably linked, and thus inseparable.
 
 
 62
 Of course I am not suggesting that a defendant charged with a political crime cannot be extradited. I am merely stating that in order to mount a successful Article 3(a) defense, a defendant should not have to prove that the extra or additional punishment or retribution that he alleges he will face will be solely on account of his race or nationality and not because of the crime he committed. The distinction the panel seeks to draw, and on which it relies as the basis for ordering that the writ of extradition be granted, simply cannot be drawn--by the panel or anyone else.
 
 
 63
 While the panel's opinion could have most unfortunate and potentially far-reaching consequences for anyone attempting to assert an Article 3(a) defense, the application of the panel's approach in this case is particularly disturbing. The panel determined that James Smyth had not met his burden of showing that the additional punishment that he feared would be imposed on him on account of his political opinions rather than on the basis of the politically-motivated crime he committed. For the reasons I have explained supra, the panel's attempt to separate the crime from the motive is unreasonable and impractical. Neither Smyth nor any other individual could ever prove that the beatings or torture he suffered were inflicted on account of his political views rather than on account of his implementation of those views in the form of an act of violence committed against people he considered his political enemies. Moreover, in this case, Smyth submitted evidence, which the district court accepted, that demonstrated that he had been beaten and tortured long before he had ever been charged with a crime. Even the panel, presumably, would have to agree that this is strong evidence that a substantial part of the barbaric treatment to which he was subjected was not related to any crime whatsoever. Had the panel understood this fact and considered the more general evidence it erroneously found irrelevant, it might well have reached a different result.
 
 Conclusion
 
 64
 The district court found that Smyth had shown by a preponderance of the evidence that he would likely be subjected to severe extra-legal punishment because of his religion, nationality, political opinions, and the political nature of the crime he committed. The panel erred grievously in simply disregarding these findings and substituting its own. The panel also erred grievously in holding that evidence tending to establish a pattern and practice of persecution against Irish Catholic nationals generally, and against Irish Catholic nationals accused or found guilty of certain politically-inspired offenses in particular, is wholly irrelevant. It erred equally grievously in concluding that the presumptions imposed by the district court failed to address the requirement that the "retaliation of detention would be on account of 'race, religion, nationality or political opinions.' " Finally, it erred grievously in holding that there is a wall of separation between political opinions and the crime committed, and that a person resisting extradition must show that he is being subjected to extra-legal punishment on account of his political opinion and not on account of the crime. These are all substantial errors that this court has an obligation to correct. This is the first case in this circuit to interpret this highly controversial treaty provision. The only other appellate case that has even considered the effect of Article 3(a) arose in the First Circuit. We should not allow this opinion to stand as a precedent for ourselves and a guide to other courts.
 
 
 65
 For the reasons set forth in this opinion, as well as for the reasons expressed in Judge NOONAN's opinion, I believe that an en banc court should be convened to remedy the panel's errors. Accordingly, I dissent from the court's failure to take this case en banc.
 
 
 
 [1]
 The second and only other presumption ordered by the district court as a result of the British government's refusal to comply with a discovery order is that the security forces in Northern Ireland either participate in or condone these brutal acts
 
 
 [2]
 This is not the place to plunge into the highly controversial questions: "Who is a Jew," who and what determines the existence of that status, is Jewishness a matter of ethnicity or religion, and why are Jews who have no attachment to any religious organization or philosophy nonetheless Jews? All we need understand for present purposes is that the statement about the fate of Jews during the reign of Adolph Hitler should inform any reasonable person that in Germany a particular group of persons were persecuted because of their religion or ethnicity. Incidentally, even though "ethnicity" is not specifically listed in the Treaty, there should be little doubt that it is covered along with "race, religion, nationality and political opinions."
 
 
 [3]
 The eponymous Diplock system stems from a report, prepared by a British Lord, on procedures for handling cases involving alleged terrorist activities. These procedures include the elimination of trials by jury. Smyth, 61 F.3d at 713
 
 
 [4]
 Smyth submitted evidence that of the prisoners in the Maze, almost all of whom have been convicted of terrorist-type offenses, the republican prisoners are subject to worse treatment than the loyalists, including beatings and dog bitings
 
 
 [5]
 The panel's opinion does say that the evidence submitted by Smyth does not "necessarily" concern people who have been convicted of crimes. 61 F.3d at 719. Aside from the fact that the panel's attempted distinction between persons suspected of crimes and those already convicted is not particularly persuasive for the purposes of Article 3(a) of the Treaty, and aside from the fact that the district court's factual findings provide no basis for making such a distinction, the panel appears to forget that the presumptions were imposed as a sanction on the British government for its refusal to permit discovery, or even in camera review, of evidence that might well have demonstrated the presence of precisely what the panel purports to find lacking. Smyth, 826 F.Supp. 316, 322 (N.D.Cal.1993)
 
 
 [6]
 Article 3(a) reads:
 "Notwithstanding any other provision of this Supplementary Treaty, extradition shall not occur if the person sought establishes ... by a preponderance of the evidence that the request for extradition has in fact been made with a view to try or punish him on account of his race, religion, nationality or political opinions...."
 Supplementary Treaty, art. 3(a).
 
 
 [7]
 "In the non-pattern or practice cases, there is a significant correlation between the asylum petitioner's showing of group persecution and the rest of the evidentiary showing necessary to establish a particularized threat of persecution." Kotasz, 31 F.3d at 853
 
 
 [8]
 As explained in part by Judge Noonan's dissent and in part by this dissent, supra, the panel not only failed to recognize that the district court had the authority to impose the presumptions as a discovery sanction and that the presumptions do not conflict with the Treaty, but it also failed to understand the meaning and content of the presumptions
 
 
 [9]
 (1) Catholic Irish nationals accused or found guilty of offenses against members of the security forces or prison officials are subjected systematically to retaliatory harm, physical intimidation and death in Northern Ireland
 (2) Members of the security forces in Northern Ireland either participate directly or tacitly endorse these actions.
 Smyth, 826 F.Supp. 316, 323 (N.D.Cal.1993).