OTERO, District Judge,
dissenting in part and concurring in part:
The facts of this case revolve around an unfortunate in-flight incident that occurred September 29, 2003, on board an international flight from Vancouver, British Columbia, to Las Vegas, Nevada resulting in the diversion of the aircraft and removal of Plaintiffs.[1]
*876 Depending on whose perspective of the events one adopts, Captain Swanigan, Alaska’s vice president of flight operations, is either a dedicated, experienced pilot who believed that an in-flight emergency required him to immediately land his aircraft, or a simpleton in charge of a cockpit crew that failed to follow airline procedures and who was buffaloed by two vindictive flight attendants into needlessly diverting the flight and forcing passengers off the plane.[2] I take the former view.
More importantly, the unintended but probable consequence of the standard my colleagues adopt for judging the in-flight conduct of a pilot under the Tokyo Convention is risk to passenger and crew safety — an affront to the principal purpose of the Tokyo Convention.[3] The majority misinterprets the standard and examines facts in hindsight that were unknown to the captain at the time of the event, concluding that Captain Swanigan may have acted unreasonably. I respectfully dissent from the adoption of a reasonableness standard in favor of a more deferential arbitrary or capricious standard.
I. Facts
It is imperative to recite the facts from the perspective of Captain Swanigan.[4] While the majority correctly states that evidence must be viewed in the light most favorable to the plaintiffs in a motion for summary judgment, using the correct standard for judging the pilot’s decision requires us to restrict the analysis to the information that the pilot knew at the moment a decision was required. Walk with me for a minute and consider the incident from the perspective of Captain Swanigan.[5]
A. The Diversion of the Aircraft
About one hour into the flight, approximately 65 miles south of Reno, Nevada, Captain Swanigan received a call on the aircraft interphone from flight attendant *877 Ms. Calloway. Ms. Calloway told him, “IVe got some passengers giving me a bit of a problem here in first class. I’d like to have security meet the airplane when we get in.” Captain Swanigan responded, “Is there anything urgent, anything-we need to know?” Ms. Calloway said, “No, I think I’ve got it under control.” Following the conversation, Captain Swanigan put the aircraft into “lockdown mode” and turned on the “fasten seat belt” sign.
Minutes later, Captain Swanigan received a second call from Ms. Calloway. According to Captain Swanigan:
She came across distraught; almost sounded like she was crying, to me, and said, Mike, I’ve lost control of the first-class cabin. And when I heard that, also I heard a bunch of yelling and screaming coming through the inter-phone .... I’ve been [with] the airline 26 years; I’ve never heard anything like that in my entire career.
Captain Swanigan confirmed with First Officer Roberts that he was indeed hearing the yelling and screaming in the background. Upon confirmation, Captain Swanigan told Ms. Calloway “we’re landing the airplane now.”[6]
At the time of this decision, the aircraft was approximately 100 miles past Reno and 200 miles from Las Vegas, with a difference in flight time of approximately 25 minutes. As Alaska Flight 694 was traveling at approximately 500 miles per hour, this means that Captain Swanigan only had a few moments to make a decision as to whether to divert the plane to Reno or commit to continuing all the way to Las Vegas. Captain Swanigan contacted air traffic control to report the passenger disturbance and to request permission to make a forced emergency landing at the nearest suitable airport. He received permission and landed the aircraft in Reno.
B. The Removal of Plaintiffs from the Aircraft
Upon landing, the aircraft was met at the gate by officers from the Reno-Tahoe Airport Police Department. Captain Swanigan requested that Ms. Calloway assist the officers in securing the first class cabin, and then meet him at the top of the jetway to discuss what had happened on board.
During his meeting with Ms. Calloway, Captain Swanigan learned the following:
• There were six passengers involved.
• They began causing problems during departure operations by distracting Ms. Calloway during safety briefings and continuing to use their cell phones after being asked to turn them off.
• While in flight, they congregated near the cockpit door, forward galley, and the forward lavatory. When told that these actions were prohibited, they responded: “[Y]ou Americans [are] so paranoid and all of these safety and security regulations [are] stupid.”
• They refused to leave the restricted area in the front of the airplane.
• After several verbal warnings, Ms. Calloway gave them a written warning and they “exploded” at that point.
*878 • The fact that there were six people in a “hostile mood” became “very intimidating” to the flight attendant crew.
Based on these representations, Captain Swanigan believed that the offending passengers had interfered with his flight crew in violation of federal law.
Captain Swanigan asked the officers to remove the offending passengers from the aircraft and press charges. Captain Swanigan had Ms. Calloway return to the first class cabin to identify the offending passengers. After Plaintiffs were identified, the record indicates that three of the Plaintiffs were asked to exit and then escorted off the aircraft (the other Plaintiffs had already voluntarily deplaned).[7]
Upon reaching the terminal end of the jetway, Plaintiffs were led to an adjacent gate area where additional law enforcement officials were stationed. Captain Swanigan, Ms. Calloway, and one of the remaining two flight attendants, joined Plaintiffs. The parties produced written statements recounting their respective versions of the incident. The officers ultimately determined that no crime had occurred and informed Captain Swanigan that Plaintiffs would not be arrested. The Plaintiffs who were escorted off the aircraft were refused carriage, and with the assistance of the officers, were boarded on a flight to Las Vegas on a different airline.
Captain Swanigan and his flight crew returned to the aircraft and resumed the flight to Las Vegas. According to Plaintiffs, once back in the air, “one of [Alaska’s] flight attendants made an announcement to all passengers that the flight had been diverted and delayed due to a disturbance created by the plaintiffs.”
II. Standard of Care
A. Under the Tokyo Convention, the Aircraft Commander’s Actions Are Judged Under a Deferential Reasonableness Standard: Her Actions Are Protected Unless They Are Arbitrary or Capricious.
The majority correctly states that the “interpretation of a treaty, like the interpretation of a statute, begins with its text. ...” Medellin v. Texas, 552 U.S. 491, 128 S.Ct. 1346, 1357, 170 L.Ed.2d 190 (2008) (internal quotation marks and citations omitted). But because “a treaty ratified by the United States is an agreement among sovereign powers, we have also considered as aids to its interpretation the negotiation and drafting history of the treaty as well as the postratification understanding of signatory nations.” Id. at 1357, 128 S.Ct. 1346 (internal quotation marks and citations omitted); see also Air France v. Saks, 470 U.S. 392, 396, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) (“ ‘[T]reaties are construed more liberally than private agreements, and to ascertain their meaning [courts] may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.’ ”) (quoting Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-32, 63 S.Ct. 672, 87 L.Ed. 877 (1943)). Accordingly, courts look to extrinsic sources to aid in the interpretation of a treaty even with a relatively low level of ambiguity.
*879 The existence of analogous United States law also may be relevant to the analysis. Cf. In re Extradition of Smyth, 72 F.3d 1433, 1441 (9th Cir.1996) (Reinhardt, J., joined by Pregerson, Noonan & O’Seannlain, JJ., dissenting) (“The panel’s interpretation of the Treaty is also inconsistent with the interpretation given the analogous United States law governing asylum and withholding of deportation .... ”); Delchi Carrier SpA v. Rotorex Corp., 71 F.3d 1024, 1028 (2d Cir.1995) (“Caselaw interpreting analogous provisions of Article 2 of the Uniform Commercial Code (“UCC”) may also inform a court where the language of the relevant [United Nations Convention on Contracts for the International Sale of Goods] provisions tracks that of the UCC.”).
Application of these principles leads me to conclude that the Tokyo Convention affords considerable deference to the inflight actions of the aircraft commander. In short, such actions are permitted unless arbitrary or capricious.
1. Although the Text of the Tokyo Convention Is Unclear as to the Degree of Deference Owed the Aircraft Commander, the Context in Which the Words Are Used Supports a Deferential Standard.
Interpretation of the Tokyo Convention standard turns on the meaning of the terms “reasonable grounds to believe” and “reasonable measures ... which are necessary.” The majority correctly states that the text of the treaty uses the words “reasonable grounds” and not “arbitrary and capricious.” Majority Op. at 866. However, it is not clear that in using the phrase “reasonable grounds,” the drafters intended the aircraft commander’s actions to be judged by a reasonableness standard as that standard has been interpreted and applied by American courts. These terms are not defined in the treaty, and the majority incorrectly asserts that the terms are clear on their face. Majority Op. at 866-67. While I acknowledge that the term “reasonable” is familiar in American law, I emphasize that the relevant text in the instant case comes from a multilateral agreement among nations with significant differences in both procedural and substantive law.[8] Examining the context in which the words are used to gain a sense of what the drafters intended to accomplish is a prudent step for courts to take. It would be an oversight on our part to assume that the phrase “reasonable grounds” in the Tokyo Convention should be construed to mean the American reasonableness standard.
Alaska and the United States argue that these terms impose a standard of deferential reasonableness, while the majority agrees with Plaintiffs in holding that they impose a standard that sounds in negligence.[9] Given the facial ambiguity of these terms, see Yusupov v. Attorney General, 518 F.3d 185, 200 (3d Cir.2008) (de *880 scribing the phrase “reasonable grounds to believe” as “ambiguous”); Williams Natural Gas Co. v. F.E.R.C., 943 F.2d 1320, 1331 (D.C.Cir.1991) (stating that the words “reasonable” and “necessary” “are among the broadest in the congressional lexicon of delegation”), the dispute cannot be resolved solely by reference to the text of the standard. However, the context in which these terms are used does support the deferential standard urged by Alaska and the United States.[10] Specifically, the “[pjowers of the aircraft commander” are broadly defined under the Tokyo Convention in a manner that suggests considerable deference should be owed the aircraft commander in her exercise of those powers.
First, deference is given to the aircraft commander as to whether to take action at all. Articles 6, 8, and 9 of the Tokyo Convention state that the aircraft commander “may” take action, not that he must take action. Only when action is taken do certain affirmative obligations attach.
Second, action is permitted under a broad set of circumstances. See Tokyo Convention, supra note 1, art. 1. The aircraft commander need not wait for a passenger to commit a dangerous or disorderly act; it is enough if the aircraft commander believes that the passenger “is about to commit” such an act. Id. at art. 6. Nor need the aircraft commander determine whether a passenger’s act will in fact imperil the aircraft, or even affect safety per se; it is enough that the act “may” jeopardize the safety of the aircraft or will jeopardize “good order and discipline on board.” Id. at art. 1.
Third, the aircraft commander is authorized to decide what action to take with regard to a disruptive passenger. Provided such action is necessary to protect the safety of the aircraft or persons or property therein, to maintain good order and discipline on board, or to facilitate delivery or disembarkation of a passenger, the aircraft commander is entitled to take any “reasonable measure[ ]” under the circumstances.
Lastly, where the aircraft commander acts in accordance with the Tokyo Convention, neither he, nor any other member of his crew, nor the airline, may be held responsible in “any proceeding.” Such broad immunity allows the aircraft commander to act without hesitation to guard passenger safety, and without concern of being second-guessed if she does — a strong indication that a commander’s judgments are entitled to deference absent a showing of arbitrary or capricious behavior.
In light of the deference given the aircraft commander as to whether, when, and how to act, as well as the accompanying grant of blanket immunity, consistency suggests that the terms “reasonable grounds to believe” and “reasonable measures ... which are necessary” should be interpreted broadly in favor of a deferential standard.
2. The Negotiation and Drafting History of the Tokyo Convention Supports an Arbitrary or Capricious Standard.
An evaluation of the negotiation and drafting history of the Tokyo Conven *881 tion — another vital step to take in order to apply the treaty properly — supports a finding that the drafters intended for the aircraft commander’s actions to be judged by a deferential reasonableness standard.
With respect to the requirement that the aircraft commander’s belief be based on “reasonable grounds,” the drafters opposed any efforts to impose a more severe test. Their comments suggest that by “reasonable,” the Tokyo Convention drafters meant to protect the actions of the aircraft commander so long as they are neither arbitrary nor capricious.[11]
For instance, the parties rejected a proposal by the Swiss delegate to substitute the term “serious grounds” for the term “reasonable grounds.” The United States delegate explained why the “less severe” reasonable standard was preferred:
At least in the United States legal system, the phrase “serious grounds” had no significant legal meaning, while, on the other hand, the phrase “reasonable grounds” had a substantial legal significance. Within the general concept of United States law, the phrase “reasonable grounds” would give the impression that the aircraft commander would be required to have a substantial basis for his belief, that he could not act on the basis of facts which were inadequate to support his belief to the effect that a person had committed or was about to commit the kind of act under consideration. In other words, the aircraft commander could not act arbitrarily or capriciously.
International Civil Aviation Organization, Minutes, International Conference on Air Law, Tokyo, Aug.-Sept. 196S, Doc. 8565-LC.152-1, at 155 [hereinafter Minutes ] (emphasis added).
The majority cites the same statement to support its position that the standard should be reasonableness. Majority Op. at 866-67. But the panel’s use of the American delegate’s statement is misplaced for three reasons.
First, my colleagues curiously omit the last sentence. This is significant — 'the sentence cuts against the majority’s notion that the arbitrary or capricious standard should be cabined to the actions of government agencies or judicial officers and also directly rebuts the majority’s claim that the drafting history “say[s] nothing about ‘arbitrary and capricious.’ ” Majority Op. at 866. Clearly, the standard was considered to be one that applied to individual aircraft commanders. Second, not even the American delegate described “reasonable grounds” as referring to some sort of objective, “reasonable person” point of view that is so familiar to American torts scholars. Instead, the delegate simply stated that an aircraft commander “could not act on the basis of facts which were inadequate to support his belief.” Minutes, supra (emphasis added). Ultimately, the standard was intended to leave room for a commander to freely make the best judgment possible, without having to conform to an amorphous “reasonableness” standard. Finally, the majority uses an American delegate’s statement as affirmation that other nations had all agreed to abide by the American reasonableness standard. But the fact that “reasonableness” is a familiar term in American jurisprudence should not preclude us from examining the intent of the other parties if *882 we are to faithfully execute the true meaning of the treaty. If anything, the American delegate’s statement illustrates the very reason why closely examining the treaty’s drafting history is critical — certain terms have different meanings for the different nations represented.
Examining the drafting history from a holistic point of view, then, demonstrates that the progression of the drafting went from a restrictive standard to a deferential one. The parties rejected a proposal by the Argentinian delegate to add words “which would indicate that the reasonable belief of the aircraft commander must be founded on some concrete external facts.” Id. at 179. The Dutch delegate stated that such a requirement would impose too “strict and rigid” a standard. Id. at 178.
Similarly, as to the requirement that the “measures” taken by the aircraft commander be “reasonable” and “necessary,” the parties appear to have rejected a simple negligence standard in favor of an arbitrary or capricious standard. The parties rejected a proposal to delete the word “necessary” because, as explained by the Greek delegate, “the word ‘necessary’ gave a guarantee that the aircraft commander would not exercise his powers in an arbitrary way.” Id. at 174 (emphasis added). The parties also opposed a French proposal to withhold immunity “if it were proved that [the aircraft commander] had been at fault.” Id. at 219. According to the delegate from the Federal Republic of Germany, the word “reasonable” sufficiently established that the aircraft commander did not enjoy unlimited immunity. Immunity would be withheld only “[i]f the aircraft commander did something without reasonable grounds, if he intentionally abused his powers or if he was guilty of serious negligence....” Id. at 227 (emphasis added). In light of similar opposition, the French delegate withdrew his proposal.
To be sure, the drafting history is not, as the majority writes, “entirely consistent” with a reasonableness standard. A thorough and careful examination of the drafting history indicates that the standard should be deferential to the commander.
3. The Majority’s Examination of Zikry Is Incomplete.
As the majority indicates, the Israeli case Zikry v. Air Canada appears to be the only published decision interpreting the Tokyo Convention’s reasonableness standard. See Majority Op. at 865-68. The majority also correctly points out that the court in Zikry held that the key questions were whether the captain had “reasonable grounds to believe that an act had been committed which jeopardize^] the safety of the flight and its passengers” and whether “the steps taken were reasonable.” See Majority Op. at 867-68; Zikry v. Air Canada, Civil File No. 1716/05 A (Magistrate Court of Haifa 2006). But the majority again misses the point: the word “reasonable” does not necessarily carry the same meaning across all legal systems. Accordingly, we must do more than a cursory search for the word “reasonable” in foreign opinions to properly interpret the Tokyo Convention.
In fact, Zikry itself contains language that indicates something other than the negligence-esque standard that my colleagues adopt. According to the court in Zikry, the proper standard conferred “extensive and wide authority” upon the captain. Id. The court also emphasized that “facts are not to be examined by hindsight [as the majority has done here], but at the time of the actual event.” Id. Such an interpretation is consistent with the arbitrary or capricious standard that the Tokyo Convention establishes, and actually sounds much like the language that this *883 court used in the Cordero and Newman cases to adopt a deferential reasonableness standard. See Newman v. American Airlines, Inc., 176 F.3d 1128, 1131 (1999); Cordero, 681 F.2d at 672.
Finally, it is worth recapping the material facts from Zikry, for they help illustrate the degree of deference the pilot should receive in her decisions. The plaintiff in Zikry was suspected of smoking a cigarette in a lavatory on a flight from Israel to Canada, detained by police upon arriving in Canada, and refused carriage by the airline on a subsequent leg of the flight. Finding that immunity was warranted, the court dismissed the action. See Zikry, Civil File No. 1716/05 A. A passenger who is smoking on a flight, while posing an annoyance to other passengers, can hardly be deemed an emergency situation. Yet the court in Zikry applied a deferential standard, isolating the facts to what the pilot knew at the time of the event and granting “extensive and wide authority” upon the pilot in his decision to refuse carriage to the passenger. In the instant matter, Captain Swanigan faced a much more dire situation than a passenger smoking a cigarette — he received word from a flight attendant that she had lost control of the cabin. Relying on his judgment and experience and knowing that he had limited opportunity to act, he landed the aircraft in response to what he legitimately perceived to be a grave threat. Presumably, if the Tokyo Convention grants deference to a pilot who bases his decision on a passenger smoking a cigarette, it also grants deference to a pilot who bases his decision on belief that the crew lost control of the cabin.
4. 49 U.S.C. § 44902(b) Supports an Arbitrary or Capricious Standard.
The majority correctly recognizes 49 U.S.C. § 44902(b) as the analogous statute for domestic air travel. But my colleagues interpret it to impose a reasonableness standard, when courts’ prior interpretations of the statute indicate otherwise. Under 49 U.S.C. § 44902(b), “an air carrier, intrastate air carrier, or foreign air carrier may. refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety.” Like the Tokyo Convention, this statute authorizes airlines to deny passage to air travelers under certain circumstances. Although § 44902(b) does not contain the phrase “reasonable grounds” like the Tokyo Convention, courts have read into the statute a deferential reasonableness standard akin to that under the Tokyo Convention: the exercise of power under § 44902(b) is proper where the aircraft commander’s belief that a passenger is or might be inimical to safety is reasonable, and where the action taken based upon that belief is reasonable. These same courts have interpreted “reasonableness” to refer to actions that are neither arbitrary nor capricious; that is, deference is inherent in this context. Based on the similarity of the § 44902(b) and Tokyo Convention standards, as well as the similarity of circumstances to which these standards apply, the case law interpreting § 44902(b)’s reasonableness requirement is particularly relevant to the instant analysis.
The first articulation of § 44902(b)’s deferential reasonableness standard was set out by the Second Circuit in Williams v. Trans World Airlines, 509 F.2d 942 (2d Cir.1975):
The test of whether or not the airline properly exercised its power ... to refuse passage to an applicant or ticket-holder rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and made its decision and whether or not the opinion and decision were ration *884 al and reasonable and not capricious or arbitrary in the light of those facts and circumstances. They are not to be tested by other facts later disclosed by hindsight.
Id. at 948. The court emphasized that a deferential standard requiring “less than absolute certainty” was necessary because decisions would need to be made in a compressed time frame and in light of the potential risks of inaction. See id. at 946, 948. Accordingly, the air carrier need not make a “thorough inquiry” before proceeding under the statute. Id. at 948. A compressed time frame, of course, is precisely what Captain Swanigan was facing.
This court adopted the Williams test in Cordero when it held that “the district court properly instructed the jury in the precise language of the Williams test.” The majority recognizes that Cordero “held that airlines don’t have immunity when they bar passengers from boarding on the basis of ‘unreasonably or irrationally formed’ beliefs.” Majority Op. at 867-68 (citing Cordero, 681 F.2d at 671). It is not clear, however, why the majority believes that this establishes a reasonableness standard. There is a subtle but important difference between examining an aircraft commander’s decisions under a reasonableness standard and permitting a commander’s actions unless un reasonable. The language in Cordero establishes the latter, which aligns with the arbitrary or capricious standard as I have articulated above. The majority’s citation of Newman is also puzzling for the same reason. My colleagues believe that this court further supported a reasonableness standard in Newman when we held that “the decision to refuse passage cannot be unreasonable or imtional.” Id. (emphasis added). Again, this language supports an arbitrary or capricious standard, not a reasonableness standard.
The Williams test was adopted most recently by the First Circuit in Cerqueira v. American Airlines, Inc., 520 F.3d 1 (2008). The court clarified that “[t]he arbitrariness or capriciousness standard here is not the same as reasonableness under a negligence standard.” Id. at 14 n. 17. Rather, an arbitrary or capricious standard appears to create a presumption of reasonableness. Id. at 14. According to the court:
Some courts have described an air carrier’s reliance on § 44902(b) as a defense in the nature of an immunity.... In our view, § 44902(b) does not merely create a defense: the statute is an affirmative grant of permission to the air carrier. Congress specifically authorized permissive refusals by air carriers; Congress did not say § 44902 was merely creating a defense. It is the plaintiff who carries the burden to show that § 44902(b) is inapplicable.
Id. The court, like other courts that have adopted the Williams test, stated that broad discretion is warranted because safety is the “first priority” in air traffic, as confirmed by the legislative history behind § 44902(b), and decisions implicating safety concerns “have to be made very quickly and based on limited information.” Id. at 12,14.
Ensuring safety in air commerce is similarly the primary objective of the Tokyo Convention. See S.Rep. No. 91-1083, 1970 U.S.C.C.A.N. at 3997 (“The principal purpose of the Tokyo Convention is to promote aviation safety....”); Brief for the United States of America as Amicus Curiae at 2, Eid, No. 06-16457 (9th Cir. July 22, 2008) (“The ‘principal purpose’ of the Tokyo Convention was ‘the enhancement of safety’ aboard aircraft.”). The drafters of the Tokyo Convention believed that giving immunity for “reasonable actions” would “enhance the proper attitudes and *885 actions necessary to significantly contribute to safety of flight in international aviation.” Id. at 3997-98. The drafters, like the courts that have interpreted § 44902(b), crafted a standard that takes into account the demanding and time-sensitive nature of an aircraft commander’s decisions. See Minutes, supra, at 223 (“While [the aircraft commander] would be comparable to the captain of a ship, he would have to deal with situations that might be more urgent.... The Conference should give some guidance to the aircraft commander who was given powers in the general interest. If nothing were included in the Convention on the point under discussion, the aircraft commander might have to hesitate and might, perhaps, do nothing in circumstances in which he should have acted.”).[12]
At the same time, the drafters were certainly mindful of the rights of passengers to be free from unwarranted discrimination, and the majority correctly points this out. But safety of civil aviation was the principal objective of the Tokyo Convention. See Minutes, supra, at 156 (“[T]here has always been an attempt to keep in sight two objectives: Firstly, the safety of civil aviation, and, secondly, the guarantees for individual freedom. For that reason the word ‘reasonable’ had been introduced.”) (emphasis added). The majority again cites to the same statement— this one made by the Dutch delegate — but comes to an odd conclusion, implying that the two objectives at all times and under all circumstances are to be weighed equally. Majority Op. at 867. It is entirely possible for two objectives to exist but have one take precedence over the other; indeed, the language itself suggests this. No statement in the drafting history indicates that these two goals are equal in importance, although we must assume they are intertwined. There is no mention of “twin” or “dual” aims, only that of having two goals. An arbitrary or capricious standard, which grants deference to the aircraft commander to allow her to firmly and confidently make decisions concerning the safety of passengers but denies her immunity when those decisions are irrational and infringe on individuals’ rights, comports more closely with the intent of the Tokyo Convention.
It is important to state that deeming individual freedoms an important but secondary goal of the Tokyo Convention does not mean they are in danger of being violated anytime an aircraft takes flight. In describing the arbitrary or capricious standard, this court stated:
The reasonableness of the carrier’s opinion, therefore, is to be tested on the information available to the airline at the moment a decision is required. There is correspondingly no duty to conduct an indepth investigation into a ticket-holder’s potentially dangerous proclivities. We believe this facet of the test provides a reasonable balance between safety concerns and the right of a ticket-holder to be free from unwarranted discrimination.
Cordero, 681 F.2d at 672. An arbitrary or capricious standard, while broad, thus has clear limits. Individuals’ freedom will not be compromised in the pursuit of safety, as the majority seems to suggest.
In light of these shared objectives and considerations, the adoption of an arbitrary or capricious standard governing actions under § 44902(b) strongly supports *886 the adoption of a like standard governing actions under the Tokyo Convention.
5. The Tokyo Convention Establishes an Arbitrary or Capricious Standard for Judyiny the Actions of the Aircraft Commander.
In light of the foregoing, I believe an arbitrary or capricious standard is proper for judging the actions of an aircraft commander under the Tokyo Convention akin to that articulated in the § 44902(b) line of cases. An aircraft commander’s actions are protected under the Tokyo Convention when the belief warranting the taking of action is neither arbitrary nor capricious and when the action taken on the basis of said belief is neither arbitrary nor capricious. Such a standard meets the principal goal of promoting air safety as well as the goal of protecting the rights of passengers to be free from unwarranted discrimination. A negligence standard, on the other hand, will result in hesitation by the pilot in circumstances where he should have acted, second-guessing by courts, and the discovery of arguments which had escaped the attention of the aircraft commander. See Minutes, supra, at 223.
B. The Diversion of the Aircraft Was Neither Arbitrary Nor Capricious.
Captain Swanigan’s decision to divert the aircraft is analyzed under Article 6.[13] According to Alaska, Captain Swanigan had reasonable grounds to believe that Plaintiffs had committed or were about to commit acts jeopardizing safety, good order, and discipline on board, and that diversion of the flight was a reasonable and necessary measure under the circumstances. Plaintiffs argue — and the majority agrees — that Captain Swanigan’s diversion may have been unreasonable because he acted without adequate inquiry into the nature of the first class disturbance, specifically: (1) when Ms. Calloway called Captain Swanigan to notify him that she was having a problem with some first class passengers and to request that security meet the aircraft in Las Vegas, Captain Swanigan agreed to call security without ascertaining the true state of events in the first class cabin; (2) when Ms. Calloway called a second time to say that she had lost control of the first class cabin, Captain Swanigan did not seek any explanation regarding the situation; and (3) at no time did Captain Swanigan look through the viewing port in the cockpit door to observe the first class cabin.[14]
*887 But if Captain Swanigan’s belief and action are to be judged on the basis of the information actually known to him at the time he formed his belief and took action— which is what would be required if we were to properly abide by an arbitrary or capricious standard and what the courts did in Cordero, Newman, and Zikry — the relevant inquiry focuses on the second phone call. It was during that call when Captain Swanigan “felt that there was a possibility that my airplane and my crew were in jeopardy” and decided to land the airplane.[15] What Captain Swanigan arguably would have known had he made further inquiries during the first call is irrelevant to the analysis. The court need only determine the facts that were before Captain Swanigan at the time he formed his belief and took action, and whether, on the basis of those facts, a reasonable fact finder could conclude that his belief or action was arbitrary or capricious. The district court correctly answered this question in the negative.
At the time Captain Swanigan received the second phone call, he was already of the belief that some first class passengers had given his flight crew some problems.[16] Ms. Calloway “came across very distraught; almost sounded like she was crying ... and said, Mike, I’ve lost control of the first-class cabin.” Captain Swanigan heard “a bunch of yelling and screaming” unlike anything he had ever heard in his 26 years with the airline. He confirmed with his first officer that the noise he was hearing was real, not imaginary. At that time, the difference in flight time between Reno and Las Vegas was approximately 25 minutes.
Based on these facts, Captain Swanigan believed that the passengers referenced in the first phone call — here, Plaintiffs — -had committed or were about to commit acts jeopardizing safety, good order, and discipline on board. Captain Swanigan made the split-second decision that landing the aircraft was necessary under the circumstances, aware that any hesitation would soon make it impracticable to make an emergency landing in Reno. There was no affirmative obligation imposed by the Tokyo Convention on Captain Swanigan to conduct a personal investigation given the facts before him, whether in the form of additional questioning of Ms. Calloway or looking through the window in the cockpit door. That the facts may not have been as Captain Swanigan believed them to be is immaterial, as hindsight and second-guessing have no place in the analysis.
For these reasons, Captain Swanigan’s diversion of the aircraft was neither arbitrary nor capricious, and is protected un *888 der the Tokyo Convention as a matter of law.
The majority, on the other hand, concludes that the captain’s decision to divert the plane must be presented before a jury. The panel cites Cordero to illustrate that this court has held that reasonableness should always be an issue for the trier of fact, thus making summary judgment improper. See Majority Op. at 867. The majority correctly states this well-established legal principle. Of course, summary judgment may be precluded in this case only if reasonableness is indeed the proper standard by which to judge the commander’s actions. I contend that it is not. Further, I find the panel’s reliance on Cordero deficient because in that case, this court explicitly adopted the deferential standard from Williams. See Cordero, 681 F.2d at 672. While the majority is correct to point out that the matter in Cordero went before a jury when this court overruled the district court’s judgment notwithstanding the verdict, there was “ample evidence in the trial record from which the jury might have concluded that [the airline] acted unreasonably.” Id. The record in the instant matter is entirely different from the one in Cordero. More importantly, we must remember that “unreasonably” in this context refers to a finding of unreasonableness under the deferential standard established in Williams. In other words, even after restricting the analysis to the “facts and circumstances ... as known to the airline at the time it formed its opinion and made its decision” and granting the captain the right to make a decision without conducting an “investigation into a ticket-holder’s potentially dangerous proclivities,” this court held that the captain in Cordero may have acted unreasonably. Id. It is not hard to see why. In Cordero, the plaintiff was accused of verbal misconduct while the plane was still on the ground. After the captain for Mexicana Airlines bizarrely announced that he would be making an unscheduled stop to pick up more passengers, several passengers on board the aircraft became upset. The plaintiff was accused of insulting the captain and crew and was subsequently not allowed to reboard. See id. Time was not as pressing — and the consequence of inaction not as significant — as it was for Captain Swanigan. Captain Swanigan faced a dramatically different situation. Here, the plane was mid-flight and the captain believed he needed to take action immediately. He received a call from a flight attendant unlike any other in his 26 years of flight experience. When examining the facts and circumstances as Captain Swanigan knew them at the time he needed to make his decision, I submit that no reasonable jury could find that he acted either arbitrarily or capriciously, as set by the Tokyo Convention.
C. The Removal of Plaintiffs from the Aircraft Is a Triable Issue of Fact.
I concur with the majority that Captain Swanigan’s decision to remove Plaintiffs from the aircraft is a triable issue; however, I iterate that faithfully following the Tokyo Convention as well as this circuit’s precedent would still require the commander’s actions to be examined under an arbitrary or capricious standard, not a reasonableness standard. As I have articulated above, Cordero and Newman both adopt a deferential standard that restricts the analysis of the decision to the facts and circumstances known to the airline at the time the decision was made. See Cordero, 681 F.2d at 672; Newman, 176 F.3d at 1131.
Cordero, as explained above, involved a passenger who allegedly became angry and insulted the captain because after takeoff, the captain announced he would be *889 making an unscheduled stop. The man was subsequently denied carriage onto the last leg of that trip. The plaintiff in Newman, a blind woman suffering from a heart condition, claimed she was denied entry onto a plane due to the airline’s discriminating against her for suffering from observable disabilities. The commanders in both Cordero and Newman made decisions to keep the plaintiffs off their flights, and the decisions in both cases were made at a time when the planes were on the ground. The facts of those cases align more closely with the disembarkation of the passengers in the instant case; it is for that reason that I concur with the majority on this particular issue. But the instant case also includes facts that were not before the courts in the aforementioned cases, namely, that the plane was in the air and the crew had reported that the cabin was out of control, requiring the pilot to make an emergency landing. If safety is the primary concern — and the drafting history of the Tokyo Convention makes clear that it is — then deferring to the pilot when the plane is in flight would naturally lead to a very different result than deferring to the pilot when the plane is on the ground. For that reason, I maintain that: (1) the proper standard, even when sending the issue of disembarkation before a jury, is the deferential standard previously adopted by this court; and (2) while the issue that went before the jury in Cordero and Newman is akin to the disembarkation issue in the instant case, it is separate and distinct from the issue of diversion.
III. Defamation
I concur with the majority in its holding that an assessment of the total circumstances surrounding the filing of the criminal complaint supports a finding that the allegedly defamatory statements made by Captain Swanigan and his flight crew were made in the course of the operations of disembarking Plaintiffs and are thus covered by the Warsaw Convention.
I also concur with the majority in its reversal of the district court’s dismissal of Plaintiffs’ defamation claim for the post-disembarkation, in-flight announcement. Nothing in the Tokyo Convention suggests it extends to lawsuits filed by former passengers for harm that allegedly occurred after the plane disembarked.
IV. Plaintiffs’ Motion to File a Supplemental Complaint
I concur with the majority in affirming the district court’s denial of Plaintiffs’ motion to file a supplemental complaint as improperly brought under Rule 15(d).
Also, I agree that whether Plaintiffs were diligent and can now file a Rule 15(a) motion for leave to amend their complaint is a question for the district court judge.
Alternatively, the district judge may deem Plaintiffs as having waived their Rule 15(a) arguments by not addressing the applicability of Rule 15(a) in their opening or reply briefs despite being given notice by the district court and Alaska that the motion fell under that rule. See Greenwood v. FAA, 28 F.3d 971, 977 (9th Cir.1994) (noting that the Ninth Circuit “review[s] only issues which are argued specifically and distinctly in a party’s opening brief.”).
CONCLUSION
For the aforementioned reasons, I respectfully DISSENT from the majority’s adoption of a reasonableness standard in favor of a deferential arbitrary or capricious standard to judge the captain’s flight decisions. Under the arbitrary or capricious standard, I submit that Captain Swanigan had no duty to conduct a thorough investigation prior to his decision to divert the plane, and could rely on the *890 distress call he received from Ms. Calloway. I CONCUR with the majority in affirming the district court’s dismissal of Plaintiffs’ defamation claims based on the statements made in the terminal, and CONCUR with the reversal of the district court’s dismissal of Plaintiffs’ defamation claim for the post-disembarkation, in-flight announcement. I CONCUR with the majority in affirming the district court’s denial of Plaintiffs’ Motion for Leave to File a Supplemental Complaint.

. The incident occurred just two years after the September 11, 2001 hijackings and attacks on New York and Washington, D.C.

. Captain Swanigan has been an Alaska pilot since 1980. In 1993, he was promoted to Chief Pilot, a position in which he managed the entire pilot group at Alaska. In 1995, he was promoted to Vice President of Flight Operations, in charge of a $400 million budget and all pilots, training, flight simulation, and flight control.

. Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Sept. 14, 1963, 20 U.S.T. 2941, 704 U.N.T.S. 219 (1969) [hereinafter Tokyo Convention].

. There is no material dispute of facts as to the information that was before Captain Swanigan.

. Indeed, the majority's recounting of the facts includes many pieces of information that are irrelevant for the purposes of judging the captain's decision. Not only does the majority include such tidbits as whether the passengers' conversations with one another were pleasant or not — something the captain could not possibly have known or factored into his decision — but my colleagues also rely heavily on the testimony of Kimberlie Shealy, whom they believe provides "the only independent account.” Majority Op. at 862. But Ms. Shealy has a dog in this fight; she was a fellow first class passenger inconvenienced because her flight was diverted. Life experience suggests that a passenger whose plans were significantly altered due to an unscheduled landing might not view the airline in a completely objective light. See Cordero v. Cia Mexicana De Aviacion, S.A., 681 F.2d 669 (1982). In any event, at the time he acted, Captain Swanigan had no information regarding Ms. Shealy's account and could not exit the cockpit to inquire further. See FAA Crew Training Manual, Common Strategy for Hijack, app. II at 21. In the event of a disturbance, pilots are to remain in the closed cockpit, and cannot leave the cabin to assist crew members.

. Plaintiffs and Shealy claim it was Ms. Duus and not Ms. Calloway who called Captain Swanigan. However, they do not dispute that he was told by a flight attendant that there had been a loss of control in the first class cabin. Plaintiffs additionally claim that Captain Swanigan lied about hearing screaming during the phone call. However, according to Plaintiff Reda Ginena, the flight attendant ‘literally screamed into the phone that she had lost control of the first class cabin....” Thus, there is no dispute that Captain Swanigan heard screaming.

. Although Plaintiffs contest this point and argue that all Plaintiffs were delivered, Judge Jones clarified any ambiguity in the record at oral argument by specifically asking Plaintiffs' counsel who extracted them and whether they left willfully. In response, Plaintiffs' counsel unequivocally admitted that the Reno-Tahoe airport police asked three Plaintiffs to leave and that those three "were removed from the aircraft but all the [sic] nine people who were traveling with them left simultaneously.... They willfully chose to leave.” Appellee’s Supplemental Excerpts of R. 8:17-25, 9:2-7.

. Under the auspices of the International Civil Aviation Organization ("ICAO”), a specialized agency of the United Nations, the representatives of 61 governments participated in the drafting and enactment of the Tokyo Convention. See Robert P. Boyle & Roy Pulsifer, The Tokyo Convention on Offenses and Certain Other Acts Committed on Board Aircraft, 30 J. Air L. & Comm. 305, 305 (1964). The Tokyo Convention was signed on September 14, 1963, by 16 of the states represented, including the United States and Canada, and was entered into force on December 4, 1969. Dep't of State, Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2007, 24 (2007). There are currently 185 parties to the Tokyo Convention, including the United States and Canada. Id.

. In our order dated April 23, 2008, we invited the United States to set forth its views as to the proper application of the Tokyo Convention. The Airline Pilots Association, International and the Air Transport Association of America, Inc. had previously filed amicus cu *880 riae briefs in support of a deferential standard.

. See Brief for the United States of America as Amicus Curiae at 9, Eid v. Alaska Airlines, Inc., No. 06-16457 (9th Cir. July 22, 2008) ("Given the breadth of discretion afforded the aircraft captain and the purpose of the Convention’s grant of immunity, review of actions taken by a captain pursuant to the Tokyo Convention must be highly deferential.”).

. This is especially true when considering that the Tokyo Convention was developed at a time when there was a discernable increase in passenger incidents that threatened the safety of international air travel, including violent hijacking. See Gerald F. Fitzgerald, The Development of International Rules Concerning Offences and Certain Other Acts on Board Aircraft, 1 CAN. Y.B. INT’L L. 230, 240-41 (1963).

. This point is particularly true where the aircraft is actually in flight, a circumstance faced by Captain Swanigan and specifically addressed under the Tokyo Convention.

. The mailing of a forced landing is an action explicitly contemplated by the Tokyo Convention. (See, e.g., Tokyo Convention, supra note 2, art. 5(2) (“In the case of a forced landing....”).) However, it is unclear whether this act should be analyzed under Article 6 or under Articles 8 or 9. Neither Article 8 nor 9 speaks to whether the aircraft commander may make a forced landing in order to effectuate a disembarkation or a delivery. Even if the authority to disembark or deliver includes the authority to make a forced landing, it is unclear as to whether the aircraft commander may make a forced landing prior to making the decision to disembark or deliver. Here, it appears that Captain Swanigan did not make such a decision until the aircraft landed and he conferred with Ms. Calloway. Article 6 speaks more generally to the taking of reasonable measures that are necessary under the circumstances. Thus, Article 6 seems to be the better fit for analyzing Captain Swanigan’s decision to divert the aircraft.

. So what if under these circumstances Captain Swanigan did not look through the viewing port? Had he done so, was he to disregard Ms. Calloway's frantic call and assume all was well if he saw no commotion? As mentioned, regulations prevent him from exiting the cockpit. What would the majority require him to do next — conduct interviews of the crew and passengers via the interphone and peephole? Moreover, the Airline Pilots Association, International explained in its appellate amicus brief that looking out the port window requires one of the pilots to unfasten his safety belt, get out of the seat, and go to the cockpit door, while the other pilot must put on an oxygen mask and take command of *887 the aircraft. Brief for the Airline Pilots Association, International as Amicus Curiae Supporting Appellee at 8, Eid v. Alaska Airlines, Inc., No. 06-16457(9th Cir. Jan. 18, 2007). While this statement is not part of the trial record, we are not precluded from relying on our common sense understanding of commercial aircraft in flight and the duties of pilots. Finally, while the Federal Aviation Administration requires windows on all cockpit doors, there is no FAA regulation requiring pilots to use them when the pilot has to act quickly and believes that failure to do so will jeopardize the lives of passengers and crew.

. Indeed, the first phone call ended with Ms. Calloway assuring Captain Swanigan, "I think I've got it under control.”

. According to Captain Swanigan, "based on the information I got, it initially sounded like a minor disturbance....” Whether this belief alone warrants calling security to the gate in Las Vegas is not a question before the court. Captain Swanigan's belief, based on the representations of Ms. Calloway, that some first class passengers had caused some problems, is but one factor in his calculus of the situation in the first class cabin at the time of the second phone call.